[Civ. No. 27533.    Second Dist., Div. Two.    Sept. 16, 1963.]

DELORES RHEA HOOD, et al., Petitioners, v. THE SU-
PERIOR COURT OF LOS ANGELES COUNTY, Re-
spondents; THE PEOPLE, Real Party in Interest.

Shafer & Seymour and Harry T. Shafer for Petitioners.

No appearance for Respondent.

William B. McKesson, District Attorney, and Robert J. Lord, Deputy District Attorney, for Real Party in Interest.

HERNDON, J.—By information, petitioners were charged with possession of marijuana in violation of Health and Safety Code, section 11530. Their motion to set aside the information on the ground that the evidence against them was obtained by an illegal search and seizure was denied, and they now seek prohibition to prevent their trial. (See *Castaneda* v. *Superior Court,* 59 Cal.2d 439, 440 [30 Cal.Rptr. 1, 380 P.2d 641]; and *Badillo* v. *Superior Court,* 46 Cal.2d 269, 271 [294 P.2d 23].)

Evidence was presented at the preliminary hearing tending to prove the following facts: Approximately three weeks prior to April 15, 1963, Officer Leavey, a narcotic agent

employed by the State of California, received some unspecified information from confidential informants that petitioner Robert Hood was engaged in the sale of barbiturates and marijuana. On April 12, 1963, Officer Leavey saw a report from the Los Angeles Police Department stating that said petitioner had been arrested on April 9, 1963, for possession of marijuana and other dangerous drugs. On the same day he checked the files of the California Narcotics Bureau and learned that petitioner Robert Hood had been arrested in 1954 for possession of marijuana.

On April 15, 1963, Officer Leavey was again advised by certain informants that petitioner Robert Hood had marijuana and other dangerous drugs in his possession. No attempt was made at the preliminary hearing to establish the reliability of these informants, and a prosecution objection to a question by petitioners' counsel seeking to learn their identity was sustained on the ground that it was "immaterial." It appears to have been the theory of the prosecution that the reliability of the information received from these unspecified sources was "immaterial" for the reason that the propriety of the subsequent conduct of the officers was not to be justified or supported by the information previously received but rather by the matters disclosed to them by their subsequent independent investigations.

Officer Leavey testified that no effort was made to obtain either a search warrant or a warrant for Robert Hood's arrest, but that on the basis of the information they had received, he and two other officers placed the Hood residence under surveillance at 8 p.m. on April 15, 1963. At approximately 8:25 p.m. on that evening, a car driven by an unknown third person parked in front of the residence. This person, who subsequently was identified as one George Geyer, so far as is revealed by the evidence, had no record of narcotic activities and was a complete stranger to the officers. The officers saw him enter the residence and leave it five minutes later in the company of Robert Hood. Although Officer Leavey testified that he never had met Robert Hood before, the record is not clear as to whether or not the other officers were able to recognize him by sight.

In any event, the two men were permitted to enter the Geyer automobile and drive away from the house. Notwithstanding that the officer expressly testified that there was nothing whatsoever unusual about the manner in which Geyer parked the car, entered the house or left it with Robert

Hood, as soon as the car pulled away the officers turned their unmarked blue sedan behind his car and attempted to stop it by means of blowing their horn and waving a portable red light out the window.

██ ··The California rule, that merely stopping a car in the course of a criminal investigation does not require that there be reasonable grounds for the arrest of the occupants, was recently reaffirmed in *People* v. *Mickelson*, 59 Cal.2d 448, 449-452 [30 Cal.Rptr. 18, 380 P.2d 658]. It was there held that the contrary federal rule enunciated in *Henry* v. *United States*, 361 U.S. 98, 103 [80 S.Ct. 168, 4 L.Ed.2d 134, 139], was not based upon constitutional grounds and hence did not prohibit the states from adhering to other reasonable rules previously developed. However, even though the circumstances authorizing such ''temporary detentions'' may be ''short of probable cause to make an arrest'' *(People* v. *Mickelson, supra,* p. 450 et seq.) nevertheless there must exist *some* suspicious or unusual circumstance to authorize even this limited invasion of a citizen's privacy. Since the prosecution here chose not to rely upon the information they claim to have received from certain unknown parties prior to the surveillance, it is difficult to perceive on what basis they determined to stop a third person's vehicle that was being driven in a completely normal fashion.

██ The record does not reveal the distances separating the cars or whether Geyer or Hood should have heard the sound of the officer's horn, or, assuming they did hear it, whether or not they should have realized that they were being commanded to stop by officers of the law. The record does indicate, however, that the Geyer car proceeded ahead at the legal rate of speed, neither accelerating nor taking any evasive action, for approximately one half a mile. There is no evidence that the occupants of the car were actually aware that they were about to be halted by the police or that they made any suspicious movements that might have indicated that they were hiding or attempting to dispose of any contraband.

Officer Leavey did testify that shortly before they decided to utilize their siren, ''I observed Robert Hood turn around once and then turn toward the front of the vehicle.'' While this statement actually does not indicate that when Robert Hood ''turn[ed] around'' he saw either the blue sedan following or the red light being waved from its window, it might be argued that these facts could be inferred from the statement; and that the further inference might be drawn that

Geyer and Hood knew, or should have known, that the vehicle following them was occupied by police officers in civilian clothes and that the officers were ordering them to halt. We need not speculate on this, however, for after Robert Hood "turn[ed] around," the officers determined to utilize their siren, whereupon Geyer immediately brought the vehicle to a stop.

The officers then advanced toward the Geyer vehicle with their guns drawn. Officer Leavey testified that at this time he "observed Robert Hood reach with his right hand toward his left shirt pocket. I was not able to observe him put anything in there or take anything out."

Both men were then removed from the car which was searched, but nothing of a narcotic nature was discovered. Both men also were searched and some cigarette papers were found in Robert Hood's shirt pocket. Geyer was asked why he had not stopped his car earlier, and he explained that he had not seen the officer's car. When Robert Hood was asked about his previous narcotic activities, he stated that, while he had used narcotics in the past, he no longer did so. He stated that he sometimes used Benzedrine when competing in motorcycle racing, but apparently he was not questioned as to whether or not this use was upon a legal prescription.

The testimony then continues: "Q. After the car was searched, what was the next thing that occurred? A. After we searched the car, then we all entered the State vehicle and drove back to Robert Hood's home on Lakme Street. Q. How did it come about that you went back? Did you ask his permission? A. No, sir. We told him that we were going to search his home; that he was under arrest. Q. What did he say? A. He then asked us for a search warrant. We told him we did not have one. Q. You also told him you didn't need one? A. Yes, I believe so. Q. Did he ask you on what grounds you were going to search his house? A. I don't believe he did, sir. Q. Did he tell you he wouldn't give you permission to search his house? A. Yes, sir. Q. What was your response to that or the response of your fellow officers? A. I told Robert Hood he was under arrest and that we were going to search his house for narcotics."

It is not necessary for us to decide whether the initial stopping of the car was proper in order to determine that the "independent" investigation made by the officers (apart from the information which they had received from the unidentified informants and upon which no reliance was

urged) completely failed to uncover any evidence which would have justified the search made of Geyer's car or the arrest of Robert Hood. (*People* v. *Mickelson, supra,* 59 Cal.2d 448, 454; *People* v. *Gale,* 46 Cal.2d 253, 257 [294 P.2d 13].)

Further, since the illegal search of Geyer's automobile and the persons of the occupants had failed to disclose any contraband, and since their statements made in response to interrogation were entirely consistent with innocence, it is immediately apparent that the sole basis for "arresting" Robert Hood was a desire to search his home. As stated in *People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927] : " 'An arrest may not be used as a pretext to search for evidence.' [Citations.] 'It is settled law that "when it appears, as it does here, that the search and not the arrest was the real object of the officers in entering upon the premises, and that the arrest was a pretext for or at the most an incident of the search," the search is not reasonable within the meaning of the Constitution. [Citations.]' "

Further, even if it could be argued that good cause for Robert Hood's arrest existed upon the facts here disclosed, it would not appear therefrom that the acts of the officers in returning to search his home were warranted as an incident thereto, "for it was at a distance from the place thereof and was not contemporaneous therewith. [Citations]." (*People* v. *Gorg,* 45 Cal.2d 776, 781 [291 P.2d 469] ; see also *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113] ; *Castaneda* v. *Superior Court, supra,* 59 Cal.2d 439, 442, and *People* v. *King,* 60 Cal.2d 308, 311 [32 Cal.Rptr. 825, 384 P.2d 153].)

When the parties again arrived at the Hood residence and knocked on the front door, Robert Hood made his lack of consent violently manifest by "yelling and fighting." He shouted, "Don't open the door, Delores. It's the cops. Don't open the door. Don't let them in." The officers then forced entry by kicking down the door only to be confronted by petitioner Delores Hood. Her lack of consent was made equally clear by the fact that she held a gun in both hands and stated, "Take one more step and I'll kill you." The officers thereupon backed out the front door and awaited reinforcements. While waiting they heard a toilet in the premises flush several times.

When ten police cars and nine motorcycles had arrived at the scene, the officers again entered and thoroughly searched the house. They discovered marijuana seeds and debris in the

vacuum cleaner and a marijuana cigarette butt behind the couch.

While it is manifestly impossible either to sympathize with, or to condone, the conduct of these petitioners, it is likewise impossible to fail to perceive that all of the events here described stemmed from the initial illegal course of action adopted by the officers. "To hold otherwise would make it a crime for a person merely to assert the right to have a magistrate determine whether police officers are entitled to seize evidence from his home. (See *Tompkins* v. *Superior Court,* 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].) Were there a right to arrest persons for insisting on search warrants and to conduct warrantless searches and seizures as incidental to such arrests, search warrants would become pointless niceties except when no one could be found at home." (*People* v. *Edgar,* 60 Cal.2d 171, 174 [32 Cal.Rptr. 41, 383 P.2d 449].)

In the instant case, the committing magistrate, in ruling upon the admissibility of the evidence, stated: "The officer made the statement under oath he felt he had reasonable cause, and, if I read the cases correctly, the question is not whether I would have reasonable cause. The question is whether an experienced officer in that specific field felt that he had reasonable cause...." In *People* v. *Edgar, supra,* at page 175, our Supreme Court, quoting from *Chapman* v. *United States,* 365 U.S. 610, 614-615 [81 S.Ct. 776, 5 L.Ed.2d 828, 832-833], and *Johnson* v. *United States,* 333 U.S. 10, 13-14 [68 S.Ct. 367, 92 L.Ed. 436, 439-441], held that " ' "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that *those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.* Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.... The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must

reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.'' ' '' (Italics added.)

█ Petitioners ''made a prima facie case that the search and seizure were illegal when [they] established that they were made without a warrant. The burden then rested on the prosecution to show proper justification.'' (*People* v. *Haven*, 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927].) The record compels us to agree that the prosecution wholly failed to discharge that burden in the instant case.

Let the peremptory writ issue as prayed.

Fox, P. J., and Ashburn, J., concurred.