[Crim. No. 9674.   Second Dist., Div. Two.   Feb. 23, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. JIMMY SOTO, Defendant and Appellant.

William T. Anderson, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Burton J. Gindler, Deputy Attorney General, for Plaintiff and Respondent.

FOX, J.*—In a jury trial defendant was convicted of robbery in the second degree. Probation was denied and he

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

was sentenced to the state prison. Defendant has appealed from the judgment.

Robert Grant Holden, the victim, testified that shortly after midnight on July 19, 1963, he stepped into the shadow of a bush in MacArthur Park in Los Angeles for the purpose of relieving himself. The next thing he recalled two policemen were standing beside him, one was holding two watches. He was at a different location in the park and had been badly cut and bruised around the face, side, wrist and hand. Mr. Holden was missing $27 in currency (two $10's and seven $1.00's), $4.00 to $5.00 in silver and a wrist watch. His watch was one of the two being held by the police officer. Mr. Holden received medical treatment for some eight or nine weeks and was still suffering from his injuries at the time of trial.

John C. Smith, a Los Angeles police officer, testified that at about 12:35 in the morning of July 19 in MacArthur Park he observed a man—Mr. Holden—badly injured and bleeding about the face and head. He also observed defendant about 50 feet away walking "very hurriedly" in a westerly direction. Officer Smith and his partner, Officer Gibe, pursued and caught defendant as he entered his car. Officer Smith observed blood on the left cuff and sleeve of defendant's shirt. When the officer stated "That's blood on your shirt," defendant stated that it was hot sauce and not blood. Defendant was placed under arrest and when he resisted he was thrown to the ground and his hands handcuffed behind him.

Defendant was searched in the process of which Officer Gibe removed a watch from his left rear pants pocket. Officer Gibe asked defendant where he got the watch. Soto "stated that he [the officer] hadn't taken that watch from his [Soto's] pocket; that he [Soto] didn't have a watch—he [Soto] didn't have that watch." In defendant's presence the watch was shown to the victim who identified it as his watch. Defendant did not make any comment. The watch was returned to the same hip pocket of defendant whose hands were still handcuffed behind him. The officers, the suspect and the victim walked to the police car at the curb to call an ambulance for Holden. Officer Smith reached into defendant's hip pocket to remove and take custody of the watch and discovered that it was not on defendant's person. They all returned to the area where they had questioned Soto initially and found the watch in the shrubbery near the sidewalk. At that time Soto stated he had found the watch in the street near his car.

Upon being questioned defendant stated that he had approximately $52 on his person and that it all belonged to him. A search revealed that defendant had a wallet in his right rear pants pocket in which there were two $10 bills and seven $1.00 bills (the same amount and in the same denominations as the victim said he was missing). In one of his front pants pockets the officers found a $1.00 bill and approximately $5.00 in change, a total of approximately $33. Officer Smith further testified that defendant had a small laceration on the rear section of his head from which a small amount of blood was coming, but which did not run down his neck onto his shirt. The laceration was, however, treated at the receiving hospital where they took the victim, Holden. It was stipulated that the stains on defendant's shirt were human blood. Defendant denied robbing Holden. The victim, not having seen the person who attacked him, was unable to identify the defendant.

Officer Fuentes of the robbery division testified that at about 3 o'clock in the afternoon of July 19 (the day on which the robbery was committed) he interviewed defendant at the jail. Defendant's statements were made freely and voluntarily, and not as a result of any threat, force or promise. Following is Officer Fuentes' account of that interview:

"Q. [by deputy district attorney] Please tell us what was said by you and this Defendant with respect to the charges in this case? A. I asked the Defendant to tell me what happened in the park the night he was arrested.

"He stated he had seen a fight. I asked him how far away he was from the fight at the time the fight occurred. He stated he was about 15 yards away.

"I then asked the Defendant what he was doing in the park at that time of the night. He stated he was there to hide a bottle in the bushes.

"I then asked the Defendant what he was doing with a man's watch in his pocket, and he stated that he saw the watch fall from the man and that he picked the watch up and stuck it in his pocket, and he said, 'I should have kept on going.'

"I then asked the Defendant how he got the blood on his shirt, and he told me that it was not blood; it was chili sauce; that he had some tacos at some hot dog stand earlier in the evening. And I told him it was blood because we had the blood analyzed on the shirt by the crime lab and they stated it was blood. Then he stated, 'I don't know how the blood got on my shirt.'

"I asked the Defendant whose money that was he had in his wallet. He said it was his own money.

"That was the substance of the conversation with the Defendant at that time.

"Q. Officer Fuentes, when he said he saw the watch fall from a man, did you ask him or did he indicate which man he saw this watch fall from? A. He stated from the man that was in the fight at the park.

"Q. And did he indicate to you how many people were involved in this fight? A. He didn't indicate to me, no."

At the trial, defendant testified that around midnight of July 19, 1963, he left Virginia's, a night club across from MacArthur Park, and went across the street to his car; that as he was opening the door he saw a watch about 3 feet away which he picked up and put in his pocket; that the police officers immediately came up and asked him where he had been; that he told them he had been at Virginia's across the street. The officers asked him to step out of his car which he did. They then brought Holden over, who said he had never seen defendant before. The officers inquired of defendant where he got the watch. He said he found it. Defendant said the officers handcuffed him and kicked and beat him and hit him in the back of the head with a blunt instrument in an attempt to extract a confession. The blood was not on his shirt before the officers came up. Defendant recalled having told Officer Fuentes that as he was parking his car he saw a fight in the park between three persons, but denied having gone into the area where he saw the fight. He also denied removing any money or a watch from Holden. When arrested defendant told the officer he had about $42; that he had a pocketful of change because he had been getting donations from various householders for painting house numbers. Officer Smith, defendant said, held up the watch to Holden and asked him whether it was his watch. Holden said it was. Defendant explained that he said nothing because the officer was talking to Holden. Blood, according to defendant's testimony, from a cut on the back of his head ran down the back of his neck.

On cross-examination defendant denied telling one of the officers that the watch in question fell from one of the men in the fight he claimed to have seen while parking his car at about 11:30 p.m. He also denied telling the officers that he had chili sauce on his shirt, that he resisted arrest, or had a struggle with the officers. He said that he felt blood on the back of his head with his hand. Defendant recalled the police

officer putting the watch back in his left rear pants pocket, but did not recall that they went back to search for the watch after they had walked over to the police car.

In seeking a reversal defendant contends:

(1) There is no substantial evidence to prove (a) that the crime of robbery was committed; or (b) that he committed the robbery.

(2) The deputy district attorney committed prejudicial misconduct with reference to defendant's past criminal record.

(3) The court prejudicially erred in not giving, on its own motion, jury instructions to regard oral admissions of defendant with caution.

(4) The officers' testimony of defendant's statements was erroneously received in evidence because there was no proof that he had been advised, before making the statements, of his constitutional rights to an attorney and to remain silent.

■ With respect to defendant's first contention, it should be initially pointed out that before a judgment of conviction will be reversed for insufficiency of evidence it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion of the trier of fact. (*People* v. *Frankfort,* 114 Cal.App.2d 680, 689 [251 P.2d 401].) ■ Also, we must assume in support of the judgment the existence of every fact which the trier of fact could have reasonably deduced from the evidence and then determine whether the facts "justify the inference of guilt." (*People* v. *Deysher,* 2 Cal.2d 141, 149 [40 P.2d 259].)

■ If the circumstances reasonably justify the determination of the trier of fact, the opinion of the reviewing court that those circumstances might also reasonably be reconciled with the innocence of the defendant will not warrant a reversal. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

■ Applying these principles to the above factual picture, it is apparent that there is sufficient evidence to adequately support the jury's finding that (1) the crime of robbery was committed; and (2) defendant committed it.

Section 211 of the Penal Code defines robbery as a felonious taking of one's personal property from his person and against his will "by means of force or fear." Defendant argues that there is no evidence that the victim's property was taken from him "by force or fear." In making this argument he overlooks the fact that severe injuries were sustained by the victim. This clearly establishes that force was used upon the victim. It may, therefore, be readily inferred that force was

used to take his property which, after the beating, was missing and found on defendant's person.

For the same reasons the circumstantial evidence supports an inference that defendant committed the robbery. He was seen near the scene of the crime, hurrying away; he had blood on his shirt cuff and sleeve; and the victim was bleeding from his injuries. The victim's watch was in defendant's pocket. Defendant also had money in his possession in the amounts and denominations that had been taken from the victim. When arrested, defendant tried to escape and had to be handcuffed and he tried to get rid of the incriminating watch. These facts and the inferences that the jury could reasonably draw therefrom point unerringly to the defendant as the perpetrator of this robbery.

The basic difficulty with defendant's argument on this phase of his appeal is that he would have this court draw inferences contrary to those drawn by the trier of fact. Under firmly established principles we, of course, are not at liberty to do this. (*People* v. *Gould,* 111 Cal.App.2d 1, 8 [243 P.2d 809].)

We find no merit in defendant's charge that the prosecutor was guilty of misconduct that was substantially prejudicial to him.

The deputy district attorney twice asked defendant on cross-examination whether he had ever been convicted of a felony. The defendant answered in the negative. Counsel then conferred with the court outside of the jury's hearing. Defendant's counsel stated that defendant had not been convicted of a felony, but that he would not accuse the deputy district attorney of bad faith because a prior offense of similar nature had been reduced to a misdemeanor by the sentence. He did not request that the jury be admonished (see *People* v. *Lyons,* 50 Cal.2d 245, 261-262 [324 P.2d 556]). But he did suggest that the prosecutor not leaf through a ''make sheet'' of three pages in the presence of the jury. The court concurred in this suggestion. By way of explanation the prosecutor stated that the officer had handed him a note that defendant had been convicted of a felony, but that the ''make sheet'' did indicate a county jail sentence which, of course, made the offense a misdemeanor. Consequently, the prosecutor desisted from further questions along that line. The prosecutor was, of course, attempting to lay a foundation to impeach the witness by proof of a prior felony conviction, but it turned out that he was mistaken. This was an under-

standable inadvertence. In these circumstances the prosecutor was clearly not guilty of misconduct.

We do not find any prejudicial error in the trial court's failure on its own motion to instruct the jury that oral admissions of a defendant are to be viewed with caution, as provided in section 2061, subdivision 4, Code of Civil Procedure. Whether such omission is prejudicial depends upon whether there was evidence of admissions involving essential elements of the crime charged without which a different verdict would be at least likely. (*People* v. *Koenig*, 29 Cal.2d 87, 94 [173 P.2d 1].)

In the instant case defendant made no such admissions. The statements of defendant to which the police officers testified related essentially to two areas: (1) the character of the stains on defendant's shirt; and (2) how the watch in question came into defendant's possession. As to the first item the parties stipulated that defendant's shirt had blood stains on it. As to the watch there was never any question but that the watch belonged to the victim, Holden. The only issue as to it was whether defendant robbed the victim of it or defendant found it as he claimed. True, it appears that when the watch was shown to Holden and he identified it as his in defendant's presence and the latter made no comment, an inference of consciousness of guilt could be drawn. Defendant, however, sought to dissipate such an inference by testifying that he did not say anything because the officer was talking to Holden, and not to him. Defendant claimed that the money on his person belonged to him, and gave an explanation of the substantial amount of change that he had in his pockets. At no time did he make any statement admitting any participation in the robbery of Holden. In view of the state of the evidence it was not prejudicial error for the trial court to fail to give the cautionary instruction on oral admissions.

The receipt in evidence of the officers' testimony of their conversations with defendant does not justify a reversal of defendant's conviction, although he was not advised by them of his right to counsel and to remain silent.

When the officers found Holden badly beaten and bleeding in a public park after midnight and saw defendant in the area, some 50 feet distant, walking away very hurriedly, they had a right to interrogate him. When he emerged from his car and they saw what appeared to be blood on his shirt sleeve and cuff, they had reasonable cause to arrest him. His resistance to the arrest and struggle with the police justified

them in pursuing their investigation. When the officers exhibited the watch to Holden in defendant's presence and the latter made no comment when Holden identified the watch as his, the officers were simply investigating an unsolved crime in an orthodox fashion. Certainly, the officers were not required to take the victim aside and ask him if the watch were his out of the presence of the defendant, for fear that if Holden identified it and the suspect failed to make any comment, any statements the latter might later make would be rendered inadmissible because defendant had not been advised of his right to counsel and to remain silent before the watch was shown to the victim. The officers asked defendant a number of questions which might well have produced a confession or damaging admissions. But neither resulted. He steadfastly denied having robbed Holden, and insisted that he found the watch and that the money on his person belonged to him. When Officer Fuentes (whose testimony we have quoted) interviewed defendant, he did not advise him of his right to counsel and to remain silent, but he, like the other officers, failed to get any confession or incriminating admission from him. True, it would have been in order to have advised defendant of his right to counsel and to remain silent, but the omission here was harmless because defendant steadfastly maintained his lack of involvement in Holden's robbery. Hence, *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], does not require a reversal. On page 356 of that decision the court pointed out that ". . . under some circumstances the introduction into evidence of statements obtained from a defendant during police interrogation in violation of his right to counsel and his right to remain silent may constitute harmless error, . . ." This statement is particularly apposite in the instant case and clearly indicates a reversal is not justified.

The judgment is affirmed.

Roth, P. J., and Herndon, J., concurred.