234 Cal.App.2d 6 (1965)
44 Cal. Rptr. 153
THE PEOPLE, Plaintiff and Respondent,
v.
GEORGE SHOJI HANAMOTO, Defendant and Appellant.
Docket No. 4476.
Court of Appeals of California, First District, Division One.
April 28, 1965.
*8 Machado, Feeley & Machado and Peter E. Tiernan for Defendant and Appellant.
Stanley Mosk, Attorney General, Robert R. Granucci and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.
SIMS, J.
Defendant has appealed from his conviction of robbery in the first degree in violation of section 211 of the Penal Code by judgment entered on a jury verdict entered in an action in which he was acquitted of two similar charges which involved other victims on other occasions. Delay in filing his notice of appeal, first perceived and alluded to by the People after the record and appellant's opening brief had been filed with the court, has been excused by the granting of defendant's *9 application for relief under rule 31(a), California Rules of Court.
Appellant originally asserted that his arrest was without probable cause and that therefore the evidence resulting therefrom should have been ruled inadmissible; and that the evidence is insufficient to support his conviction. At oral argument the issues were broadened to include an examination of the propriety of the admission of testimony concerning statements of the defendant which were elicited from him at the time he was arrested and thereafter while in custody.
The facts concerning the robbery of which he was convicted are as follows: About 9:15 p.m. on January 11, 1963, a black and yellow car drove up to the entrance to the Moonlight Drive-In motion picture theater in Santa Clara. The car pulled ahead a little out of line so the cashier had to reach and could not see into the car. The driver kept his face turned to the side and just held his hand out as he gave her two one-dollar bills and received a quarter and 50-cent piece in change, along with a ticket torn lengthwise to indicate to anyone checking the cars that there was only one person in the car when it entered. The driver's actions attracted her notice as similar to those that might be exhibited by one who had a person in the trunk or planned to pick someone up who came in over the fence. She did notice that he was an Oriental, of an age in his late 20's or early 30's, and at the time was hatless, had no dark glasses on, and wore no coat, only a sweater or shirt of a soft tone, grey-tan or brown.
Shortly before 10 p.m. the cashier made up her hourly box-office ticket report which involved making a record of the numbers on the tickets, and counting the money. She retained $121 in currency consisting of twenty-one $1 bills, and $100 in five, ten and twenty dollar denominations, and some coin, and dropped the excess into a safe.
At approximately 10 p.m. a car coming out of the drive-in pulled up on the other side of the cashier's booth and stopped. The door was bolted and as the cashier started to pull the bolt someone pounded on the door and she proceeded to open it. She was confronted by the man she had seen about 45 minutes before in the same black and yellow car. At this time he was attired in a grey topcoat, had a black scarf draped over his head hanging down to his shoulders, had a hat on his head and was wearing dark glasses, and black or dark gloves. He pointed a gun at the cashier and told her it was a holdup and that he wanted all the currency. She pressed an emergency *10 buzzer and picked up the currency out of the drawer and gave it to him. In order to convince him she had no more currency when he insisted she did, she pulled out the drawer and held it up to him. He told her not to answer a buzzer that sounded in the office, and he left in his car.
The cashier observed and put down three letters from the license plate of the vehicle, and picked up the phone. She found that the manager already had the police department on the line and she gave them the description of the car as best she could and told them the perpetrator was an Oriental with hat, topcoat and glasses. A few minutes later she repeated the information to officers who arrived at the scene. At about 10:02 p.m. a broadcast went out describing the robbery suspect as "male oriental, approximately 28 to 30 years old, wearing a felt hat with a dark black scarf wrapped around his head, dark sun glasses and a grey topcoat," and the vehicle as a "1955 and/or 1956 yellow and black Plymouth with the letters of a license DGY."
At about 10:30 p.m. Patrolman Hawkins of the Santa Clara Police Department, who with a partner was cruising around the area looking for the person responsible or the vehicle involved, observed a male Oriental in the middle of the block on Humboldt Street walking on a lawn on the north side of the street in a southwesterly direction. He was attired in slacks, sport shirt and black sweater, and wore no jacket or overcoat although it was a very cold night with ice crystals on the tops of parked cars and an estimated temperature in the twenties or low thirties.
The officer had his partner stop the car, ran around the back of the car, and told the suspect, who was then about 6 or 7 feet off the left rear of the vehicle, to "Hold it." He proved to be the defendant, George Hanamoto, and gave his correct name and the block and street on which he was then residing in response to the officer's questions. He was unable to produce a driver's license or other identification. The officer directed him to take his hands out of his pockets and to place everything in his pockets on the trunk of the patrol car. He produced one nickel, one Marlboro cigarette and a cigarette lighter.[1] The defendant allegedly stated, "`that he and his *11 wife were en route to the Jamaica Inn, that she had let him out of the car at Kiely and Benton Street [1 block to the south] because she wanted to go buy some hair spray and he was willing to get out of the car because he wanted to make a telephone call at that corner, and he was just walking around the area waiting for her to pick him up.'" There was no phone booth in the vicinity of Kiely and Benton Streets, or in the vicinity of Kiely and Humboldt Streets at that time. The closest booths were at the Moonlight Drive-In, or a quarter of a mile west on Benton. Following this five-minute exchange the defendant was placed under arrest, taken into the patrol car, and transported to the scene of the robbery.

Legality of Defendant's Arrest
At this point at the trial defendant did and by his appeal he does interpose the objection that his arrest was illegal, and that the evidence subsequently developed by exhibiting him to the cashier for identification, and from statements attributed to him while in custody was erroneously admitted. Reliance on this proposition involves the establishment of two predicates, first, that the arrest was unlawful, and, secondly, that the evidence obtained was obtained not merely during the period of an illegal detention but as a result thereof.
Defendant relies upon the provisions of section 836 of the Penal Code which require that an officer have "reasonable cause to believe that the person to be arrested has committed a felony" in order to justify an arrest without a warrant; and cites People v. Mickelson (1963) 59 Cal.2d 448 [30 Cal. Rptr. 18, 380 P.2d 658]; People v. Hilliard (1963) 221 Cal. App.2d 719 [34 Cal. Rptr. 809]; Hood v. Superior Court (1963) 220 Cal. App.2d 242 [33 Cal. Rptr. 782]; People v. Gibson (1963) 220 Cal. App.2d 15 [33 Cal. Rptr. 775]; People v. Zabala (1963) 217 Cal. App.2d 550 [31 Cal. Rptr. 712]; People v. Ellsworth (1961) 190 Cal. App.2d 844 [12 Cal. Rptr. 433]; and People v. Harris (1956) 146 Cal. App.2d 142 [304 P.2d 178] as setting forth the applicable principles. [1] He concedes, as set forth in Mickelson, supra, 59 Cal.2d 448, 450-451, that, "In this state, however, we have consistently held that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning. If the circumstances warrant it, he may in self-protection request a suspect to alight from an automobile or to submit to a superficial search for concealed weapons. Should the investigation then reveal probable cause *12 to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. [Citations.]" (See also People v. One 1960 Cadillac Coupe (1964) 62 Cal.2d 92 96 [41 Cal. Rptr. 290, 396 P.2d 706]; People v. Hilliard, supra, 221 Cal. App.2d 719, 723; People v. Gibson, supra, 220 Cal. App.2d 15, 20-21; People v. McLaine (1962) 204 Cal. App.2d 96, 100-101 [22 Cal. Rptr. 72]; People v. Porter (1961) 196 Cal. App.2d 684, 686 [16 Cal. Rptr. 886]; People v. Ellsworth, supra, 190 Cal. App.2d 844, 846-847; People v. Cantley (1958) 163 Cal. App.2d 762, 766 [329 P.2d 993]; People v. Harris, supra, 146 Cal. App.2d 142, 145 and cf. Hood v. Superior Court, supra, 220 Cal. App.2d 242, 245; and People v. Freeland (1963) 218 Cal. App.2d 199, 201 [32 Cal. Rptr. 132].) It is further asserted, however, that in this case, as in Mickelson, the investigation failed to reveal probable cause to make an arrest, and that therefore any further detention was illegal and the results thereof should not be used against the defendant at his trial. (59 Cal.2d 448, 452-454; and see People v. One 1960 Cadillac Coupe, supra, 62 Cal.2d 92, 96-97; Hood v. Superior Court, supra, 220 Cal. App.2d 242, 245-249; People v. Gibson, supra, 220 Cal. App.2d 15, 21-26; People v. Zabala (1963) 217 Cal. App.2d 550, 552-555 [31 Cal. Rptr. 712]; People v. Macias (1960) 180 Cal. App.2d 193, 195-197 [4 Cal. Rptr. 256]; People v. Harris, supra, 146 Cal. App.2d 142, 145-147.)
[2] "Reasonable or probable cause for an arrest has been the subject of much judicial scrutiny and decision. There is no exact formula for the determination of reasonableness. Each case must be decided on its own facts and circumstances [citations]. [3] Reasonable cause has been generally defined to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime. [Citations.] [4] Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt. [Citations.] It is not limited to evidence that would be admissible at the trial on the issue of guilt. [Citation.] The test is not whether the evidence upon which the officer acts in making the arrest is sufficient to convict but only whether the person should stand trial. [Citation.]" (People v. Ingle (1960) 53 Cal.2d 407, 412-413 [2 Cal. Rptr. 14, 348 P.2d 577], cert. den. 364 U.S. 841 [81 S.Ct. 79, 5 L.Ed.2d 65] and see People v. Hall (1964) 62 Cal.2d 104, 107, fn. 3 [41 Cal. Rptr. 284, 396 P.2d 700]; People v. Ketchel (1963) 59 Cal.2d 503, *13 526 [30 Cal. Rptr. 538, 381 P.2d 394]; People v. Torres (1961) 56 Cal.2d 864, 866 [17 Cal. Rptr. 495, 366 P.2d 823]; People v. Gilmore (1962) 211 Cal. App.2d 35, 38 [27 Cal. Rptr. 59].)
From the first precept above it might be implied that an examination of the factual situations in the cases cited in support of the proposition upon which appellant relies would be profitless. Those cases, however, and others, hereinafter set forth, in which arrests have been upheld do furnish pinpoints of an outline from which it is possible to plot a channel of propriety. It is noted that precedents are utilized interchangeably regardless of whether they involve a situation where suspicion on criminal activity (usually possession of contraband) gives rise to investigation with resultant arrest of which the probable cause therefore is in issue, or a situation, as present here, whether there is no question but that a felony has been committed and the issue is whether or not there is "reasonable cause for believing the person arrested to have committed it"  in which case even a private person may arrest without a warrant. (See Pen. Code, § 837, subd. 3; People v. Chacon (1963) 223 Cal. App.2d 739, 741 [35 Cal. Rptr. 799]; People v. McCarty (1958) 164 Cal. App.2d 322, 328 [330 P.2d 484].) For purposes of this case examination is confined to cases involving the latter situation. Where the suspicion is slight and the arrest leads to a charge for a crime other than those which justified the detention and interrogation, the fruits of the arrest may be excluded. In Mickelson, supra, where the investigation was for a robbery and resulted in charges of burglary from evidence held to have been unlawfully seized, "The officer also testified that there was nothing in his conversation with Zauzig that would indicate that he had perpetrated a robbery other than that he acted a bit friendly. The movements of the car were such that it was obvious that the occupants were either trying to evade the officer or were confused and did not know the area very well. His purpose in examining the bag was the `possibility of a gun being there.' After he had talked to Zauzig and defendant he was satisfied that they had not been involved in the robbery." (59 Cal.2d 453-454.) The court concluded, "Instead of interrogating Zauzig and defendant with respect to the robbery or requesting them to accompany the officers the few blocks to the market for possible identification, the officer elected to rummage through closed baggage found in the car in the hope of turning up evidence that might connect Zauzig with the robbery. That search exceeded the bounds of reasonable investigation." (59 Cal.2d 448, 454.)
*14 In Macias, where the officers were seeking a robbery suspect of Mexican extraction, defendant was picked up in an area where hundreds of Mexicans would fit the description given, and they did not even interrogate him. (180 Cal. App.2d 193, 195.)
In Gibson, the arrest led to the discovery of evidence which led to prosecution for the very robbery under investigation. It is the only case alluded to by the parties in which the arrest was proscribed under those circumstances. It may be assumed that its close similarity to Mickelson compelled such a conclusion. In fact the opinion states, "As in Mickelson, the officers did not interrogate defendant as to the robbery or request him to accompany them to the gas station for possible identification. They apparently asked for no identification of defendant." (220 Cal. App.2d 15, 24.)
[5] Turning to the facts in the instant case, it would appear that on the basis of the knowledge and description the officers had they were justified in stopping and interrogating defendant as a male Oriental walking at a fast pace in a side street in the neighborhood of the scene of the robbery. On the one hand, he was candid in giving his name and address; he was divested of those articles which gave particularity but also disguise to the robber; and was afoot rather than in a car. On the other hand, he lacked identification; his story inherently invited skepticism and was patently incredulous because of lack of a phone booth and lack of wherewithal to operate the phone if one had been there; and the very lack of an outer garment was strange because of the temperature.
It is concluded that the officers properly took defendant into custody. (See People v. Parham (1963) 60 Cal.2d 378, 382-383 [33 Cal. Rptr. 497, 384 P.2d 1001]; People v. Burke (1964) 61 Cal.2d 575, 577 and 580 [39 Cal. Rptr. 531, 394 P.2d 67]; People v. Harris (1964) 231 Cal. App.2d 214, 217-218 [41 Cal. Rptr. 642]; People v. Chacon, supra, 223 Cal. App.2d 739, 741-742; People v. Smith (1963) 223 Cal. App.2d 394, 405-406 [36 Cal. Rptr. 119]; People v. Koelzer (1963) 222 Cal. App.2d 20, 26-28 [34 Cal. Rptr. 718]; People v. Gilmore, supra, 211 Cal. App.2d 35, 38-39; People v. McLaine, supra, 204 Cal. App.2d 96, 99-102; People v. Jackson (1960) 183 Cal. App.2d 562, 569-570 [6 Cal. Rptr. 884]; People v. Miller (1959) 176 Cal. App.2d 571, 575-576 [1 Cal. Rptr. 656]; People v. McCarty, supra, 164 Cal. App.2d 322, 328; People v. Cantley, supra, 163 Cal. App.2d 762, 764-767; People v. Borbon (1956) 146 Cal. App.2d 315, 317-319 [303 P.2d 560].)
*15 In any event, the question of whether or not his arrest, be it legal or illegal, precluded an intelligent choice as to whether he voluntarily wished to go to the scene for possible identification or exoneration as suggested in Mickelson and Gibson (see 59 Cal.2d at p. 454; 220 Cal. App.2d at p. 25) may be removed from further consideration. According to his testimony, when upon entering the patrol car, he was advised of the nature of the offense of which he was charged and the officer's decision to return to the theater, he assented to going though he denied he had been there earlier. (See People v. Parham, supra, 60 Cal.2d at p. 383; and People v. Koelzer, supra, 222 Cal. App.2d at p. 27.)
Before proceeding with a review of the events of the evening, it is noted that the statement first quoted above was made before defendant was taken into custody, was in response to an investigatory rather than an accusatory process of questioning, and therefore is without the scope of the rule of People v. Dorado (1965) 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361], hereinafter discussed, even if the question of whether the investigation had focused on defendant prior to his arrest is resolved in the affirmative.
When advised that he was being brought in for armed robbery and that he fit the description, defendant asked the officer if it was a male Oriental that did it, and upon receiving an affirmative reply, stated, "`I was in the right place at the wrong time.'" No further consideration is given to this statement as its cryptic nature makes it difficult to determine whether it is incriminatory (in the sense that he was out too early to meet the person who was to pick him up) or exculpatory (in the sense that he was a victim of an unfortunate coincidence).
[6] The confrontation with the cashier was not conclusively revealing. Admittedly she was very upset and did not want to look at him. The most that can be said is that she indicated that defendant looked like the robber, and that his voice sounded like the same voice which had demanded the money.
Regardless of the unsatisfactory nature of this interview the circumstances certainly gave rise to reasonable cause to arrest the defendant at this point. (Gorlack v. Ferrari (1960) 184 Cal. App.2d 702, 709 [7 Cal. Rptr. 699], and see cases, infra, p. 17.) If it be assumed that the prior detention was illegal, it was only a circumstance giving rise to his identification at the time it occurred. It did not cause the identification. It *16 might have taken place at any time in the future unless defendant, if not arrested, chose to flee. The trial court, therefore, did not err in permitting the prosecution to go forward with evidence of this identification. (See People v. Freeland, supra, 218 Cal. App.2d 199, 201-204; and People v. McCarty, supra, 164 Cal. App.2d 322, 329.)
The question of whether the subsequent statements attributed to defendant were the product of an illegal arrest appears to be foreclosed by the foregoing conclusions. In any event, it is more than encompassed by the criteria laid down by Dorado, supra, which will be hereinafter discussed.

Sufficiency and Admissibility of the Evidence
The sufficiency of the evidence is interpolated before a discussion of the admissibility of the remaining statements of the defendant because it may bear upon the questions thereby raised and place such statements in proper perspective. The defendant throughout his interrogations and at the trial denied the commission of the offense charged. There were no confessions offered but the statements contain admissions of ownership of property and also narrations of events of the evening inconsistent with the explanation given by defendant on the witness stand. [7] It must be conceded that all statements made after his confrontation with the cashier were made after he was in custody, actual or constructive, while on bail; that the investigation was no longer general and was focused on him; and that for the most part they emanated from a process of interrogation which admittedly was designed to elicit incriminatory statements. There is no evidence that defendant was ever advised of his right to counsel or his right to remain silent. Under such circumstances the incriminatory statements cannot be used against the accused (People v. Dorado, supra, 62 Cal.2d 338, 353-355; People v. Stewart (1965) 62 Cal.2d 571, 576 and 581 [43 Cal. Rptr. 201, 400 P.2d 97]), and their admission requires reversal unless it is harmless error. (62 Cal.2d at p. 356.) [8] The test of harmless error has been defined, in elaboration of the provisions of article VI, section 4 1/2 of the California Constitution, as follows: "That a `miscarriage of justice' should be declared only when the court, `after an examination of the entire cause, including the evidence,' is of the `opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (People v. Watson (1956) 46 Cal.2d 818, 836 [299 P.2d 243]; and *17 see People v. McLaine, supra, 204 Cal. App.2d 96, 102; People v. Jones (1965) 232 Cal. App.2d 379, 392 [42 Cal. Rptr. 714]; People v. Finn (1965) 232 Cal. App.2d 422, 428-429 [42 Cal. Rptr. 704]; People v. Soto (1965) 232 Cal. App.2d 437, 445 [42 Cal. Rptr. 799]; People v. Herrera (1965) 232 Cal. App.2d 561, 563 [43 Cal. Rptr. 14]; People v. Saldana (1965) 233 Cal. App.2d 24, 32-33 [43 Cal. Rptr. 312]; People v. Campbell (1965) 233 Cal. App.2d 38, 45-46 [43 Cal. Rptr. 237]; People v. Cockrell [*](1965 Cal. App.) 43 Cal. Rptr. 510.)
Attention is now directed to the other facts as they developed during the investigation and were revealed at the trial.
In the first place, it should be pointed out that the testimony of the victim at the trial in which she identified the defendant as the perpetrator, if the record is otherwise untainted, is sufficient to sustain the conviction. (People v. Clapper (1965) 233 Cal. App.2d 34, 36 [43 Cal. Rptr. 105]; People v. McLaine, supra, 204 Cal. App.2d 96, 103-104; People v. Wyback (1961) 193 Cal. App.2d 754, 755-758 [14 Cal. Rptr. 501]; People v. Jackson, supra, 183 Cal. App.2d 562, 566-568; People v. Robinson (1956) 146 Cal. App.2d 310, 312-313 [303 P.2d 633].) It being alleged herein, however, that the record is tainted, further inquiry is indicated.
[9] In addition to the circumstances referred to above concerning the commission of the offense and the apprehension, identification, and detention of defendant the record reflects: About 11 p.m., after the defendant had been taken into custody, a car similar to that described by the victim and with the same letters as noted on the license plate was found near Kiely Street, the north-south thoroughfare upon which the drive-in premises abut, on the fourth cross-street south of the drive-in, and one cross-street north of where defendant was apprehended. A picture of this vehicle was identified by the victim. The owner of the car testified it had disappeared from a parking lot in San Jose at some time during a 24-hour period terminating at 2 a.m. on January 10. Subsequent examination of the car revealed a fresh cut of the wires leading to the rear license plate light. No other physical evidence was developed from a check of the car. The defendant later told an officer that one Howard had this car on July 10, 1962, and testified with less certainty as to the nature of the car this individual had let him use on that occasion.
*18 While the officers were assembled and searching in the area of the car a lady's black scarf was found about 8 or 10 feet in front of the car. The victim identified it as being the same as that she saw draped over the defendant's head. Dana, the young lady with whom defendant resided on Poco Way, testified that the scarf was hers, that she wore it quite often, that it was kept in a drawer at her residence, and was not there when she returned on January 12 with an officer and searched for it.
About 11 p.m. just after the discovery of the vehicle used in the robbery, a black Corvette was observed driving up and down Kiely Street. Shortly thereafter it turned into the street on which the vehicle was found and stopped by a patrol car. The young lady driving the car asked how to get to Homestead Boulevard, a street 3 blocks to the south in an orchard area past the residential development. The officer indicated the direction, and she asked if anything was wrong.
Subsequently, it was determined to pick up the Corvette and an unmarked unit located it about midnight and followed it on streets lying north of the drive-in theater until it came to a dead end. The driver was identified as Maxine Dana Shepherd, and the car was found to be registered to an Amy Hanamoto, the defendant's sister. The driver was requested to drive down to the police station to answer a few questions. She was escorted there with police cars ahead and behind, and turned over for questioning to the officer who had arrested the defendant.
There is a conflict in the evidence as to whether or not Dana gave consent to a search of the car and turned over the keys to the officers for that purpose. No offer to examine her or the defendant on voir dire was made at the time the question arose, and the court overruled the objection on the then uncontradicted testimony of the officer that consent was given. A 50-shell cartridge box, containing 43 cartridges for a .25 caliber automatic was found in the locked glove compartment. At the trial defendant admitted these shells were his.
According to her testimony, Dana at that time told the officers who first apprehended her that she was looking for a grocery store to buy a quart of milk. She voluntarily went to the police station and repeated her explanation to the officer there. During the course of a night-long interrogation she gave several conflicting stories in an admitted attempt to protect the defendant and herself and finally recounted that she had driven him over to the area and had returned to pick him *19 up at his request. This lengthy interrogation was taped. She was held all night and not released until 11:15 the morning of the 12th.
At the trial, insofar as the instant offense is concerned, Dana testified that she and the defendant planned to go out to the Jamaica Inn in Sunnyvale where they formerly worked together; that he took her daughter and a friend's child to the friend's house and returned and picked up the witness at 8:30 or 9 p.m.; that he told her he wanted to or was supposed to meet somebody at the Moonlight Bowl and requested her to drive the car back; that they went by the Garden City Hof Brau where she cashed an alimony check for $50; that defendant drove to the Moonlight Bowl, left her the car; and that she returned home. She further testified that she returned and encountered the officers on the two occasions referred to above, and that on the first occasion she intended to meet George around a corner two blocks down on Kiely Street.
Her prior inconsistent statements which were made while she was in custody were used to impeach her, but inasmuch as there was no issue concerning the foregoing facts there was no prejudice to defendant.[2] Independent witnesses corroborated her visit to the Hof Brau, and her return to the scene is vouched for by the officers.
[10] The following morning, January 12, in the course of a further search of the area a rolled-up overcoat was found in weeds about 16 to 18 feet off the east side of Kiely, approximately 120 feet north of the street on which the car was found, or about 3 blocks south of the drive-in. The label in the coat was that of a men's wear store in Anchorage, Alaska. The pockets of the coat yielded a gun loaded with a clip of seven shells, some money, a pair of dark glasses, gloves and a ticket stub.
The victim testified that the coat looked like the same type as that worn by the defendant; that the gun used would be the same as that found; that the sun glasses worn by the robber would be like those found in the coat pocket; and that *20 there was nothing different about the gloves which were found to distinguish them from those she observed on defendant. The money, $121, was in denominations similar to those the cashier had counted just prior to the hold-up, with the addition of a 50-cent piece and a quarter. She identified the ticket stub as one sold to a single patron between 9 and 10 p.m. on the night of the robbery.
The articles were returned to the Santa Clara Police Department headquarters and were exhibited to defendant who was still in custody. He stated that the coat appeared to be his coat, and when asked if he could positively identify the coat, he replied that if the label was from Anchorage, Alaska, it was his coat. He told the officers that he had seen it recently and that it should be hanging in his closet at his residence at San Jose, and that he had no knowledge of how it got from his closet to the Santa Clara area. Then he changed his story and stated that the coat, along with his pistol, had been stolen from him in Los Angeles the previous year.
On Tuesday, January 15, two days after the defendant had bailed out, he was at the San Jose Police Department in connection with the investigation of another robbery. When advised by an officer from the Santa Clara Police Department that the explanation he had given for his presence near the scene was not "feasible," he stated that he "dreamed up" this story, and gave a new account, hereinafter referred to. Insofar as his coat was concerned, defendant alleged he was in possession of the coat of one Howard. Upon meeting the latter at the Moonlight Bowl, apparently in the same general area as the theater, defendant gave him his coat and was assured by him that he would return Hanamoto's coat later.
At the trial Dana testified defendant had a tan heavy linen overcoat over his arm when she left him off at the Moonlight Bowl. The defendant testified that he grabbed an overcoat out of the closet as he left and did not discover it was not his until after Dana left him off; and that on meeting Howard between 9:30 and 10, he asked him for his coat, and was told the coat was in Howard's car and would be returned in awhile. He admitted on the stand that he had advised the officers that the coat they found was his, and identified the exhibit as his.
In the early morning hours, before the gun had been found, when asked if he ever owned a gun, defendant admitted he had owned a.25 automatic which had been stolen from his car in Los Angeles the preceding April or July; and stated *21 that he had purchased the gun for self-protection while working at Brookdale Lodge. At the later confrontation he told the officers that he had purchased an identical .25 caliber automatic from a sporting goods store in Santa Cruz, but he did not know the serial number; that it had been stolen from his car in Los Angeles in July 1962, and first stated that the Los Angeles Police Department would have a report of the theft, and changed his statement to the assertion that a friend was to have reported the theft.
A subsequent check with the Santa Cruz Police Department confirmed that the weapon was registered there.
The Santa Clara officer had no recollection of any mention of the gun when he interviewed the defendant on the 15th, but a San Jose officer investigating a January 4, 1963, theater robbery in that city asked the defendant if he owned a gun. The defendant stated he owned a .25 caliber automatic and that on January 4 it was in a drawer at Dana's apartment: that he never had it out of the house, and did not know it was missing until the police showed it to him.
At the trial Dana testified she had seen the defendant with a similar gun, but had not seen it for over eight months prior to January. On direct examination the defendant admitted ownership of a gun similar to that in evidence which he had purchased in March for self-protection at Brookdale Lodge, and stated that he never carried it around, did not have it with him on the 11th, and left it at Dana's apartment in her drawer. On cross-examination he admitted the discrepancies in his prior accounts of the whereabouts of the gun, but reiterated it must have been taken from the apartment.
He denied ever seeing the money, gloves or ticket stub when they were exhibited to him, and in testifying reasserted that he had never seen the gloves prior to the time the officers exhibited them. The sun glasses were not brought in at the first inquiry. Dana testified that they were of the same type that the defendant had, but they did not seem to be the right color. She also denied ever seeing the gloves before they were exhibited to her after the offense. The defendant testified he did not know whether he had ever seen the sun glasses which were found with the overcoat.
From the foregoing it is readily apparent that the jurors, in addition to relying upon and accepting the identification of defendant by the victim, were entitled to, and it is reasonably probable they did, rely on not only defendant's apprehension near the scene but also his ownership of the coat *22 and gun which were found in close proximity corroborating the victim's testimony. The issue of ownership of these articles cannot be lightly dismissed. It does not, however, necessarily follow that defendant's admissions in regard to his ownership of the coat and gun are prejudicial. The record discloses that the gun was registered to him in a neighboring county, it is unthinkable that a check of his former employment and residence would have failed to reveal this fact, and in truth it appears from defendant's admissions that he was well aware the gun would be traced to him, and prepared for that eventuality even before it was found. Similarly the overcoat, if not sufficiently tied to him by the gun in the pocket thereof, by reason of its Alaskan origin, would well lend itself to tracing to the individual possessor. In short, the admissions although tending to incriminate the defendant, were not prejudicial in that they disclosed ownership which was otherwise established and which could not have been succesfully denied by him had he remained silent or had counsel. (See People v. Campbell, supra, 233 Cal. App.2d 38, 45-46; People v. Saldana, supra, 233 Cal. App.2d 24, 32-33; People v. Finn, supra, 232 Cal. App.2d 422, 426-429; People v. Ghimenti (1965) 232 Cal. App.2d 76, 82-83 [42 Cal. Rptr. 504]; see also People v. Clapper, supra, 233 Cal. App.2d 34.)
[11] There is no question but that defendant after he was taken into custody was subjected to the process of interrogation which is condemned by Dorado and the cases upon which it is predicated. Admittedly attempts were made to mislead the defendant in order to secure a confession, and the proceedings were recorded on a tape which ultimately proved unintelligible because of background noises. The interrogation which lasted until 3 or 4 a.m. was fruitless. Defendant denied participation in the robbery. So far as appears from the record he merely reiterated the story which he related prior to his arrest, which is set forth above. This statement was later used to impeach him, and if it were obtained originally as part of the accusatory process there might be some question as to the propriety of its use. (Cf. People v. Jones, supra, 232 Cal. App.2d 379, 391-393; and People v. Ulibarri (1965) 232 Cal. App.2d 51, 55-56 [42 Cal. Rptr. 409] with People v. Burns (1965) 232 Cal. App.2d 587, 589-590 [43 Cal. Rptr. 84].) In view of the admissibility of the earlier statement, no error should be predicated upon its repetition under less favorable circumstances. (See People v. Danielson (1965) 233 Cal. App.2d 329, 332 [43 Cal. Rptr. 644].)
*23 On January 15 at the San Jose Police Department a Santa Clara officer investigating the Moonlight Drive-In robbery indicated to defendant that his story was not "feasible." Defendant admitted that "he dreamed up this story." He then gave a story involving one Howard.[3] At the trial he testified substantially in accordance with this explanation. Neither Howard nor Ella appeared at the trial and defendant testified that he could not recall Howard's last name and was unable to locate either though he had looked for them. He admitted that the first account which he gave the arresting officer before and after his arrest was false. This exculpatory statement if it be deemed within Dorado, despite being made while the defendant was out on bail, falls within the principles of the cases last noted above. (People v. Jones, supra, 232 Cal. App.2d 379, 392-393; People v. Ulibarri, supra, 232 Cal. App.2d 51, 55-56; and People v. Danielson, supra, 233 Cal. App.2d 329, 332.) As in the Miller case, note should be taken of the suggestion in Fahy v. Connecticut (1963) 375 U.S. 85, 91 [84 S.Ct. 229, 11 L.Ed.2d 171], that use of illegally obtained evidence may affect the conduct of the defense. In *24 this case defendant did not have to testify so much as to explain his prior statements as he did to explain his identification by the victim and presence near the scene of the offense shortly after it was committed.
The judgment is affirmed.
Sullivan, P.J., and Molinari, J., concurred.
NOTES
[1] No objection was made to this procedure at the time or at the trial and it not being in issue (People v. Saldana (1965) 233 Cal. App.2d 24, 33 [43 Cal. Rptr. 312]; People v. Clapper (1965) 233 Cal. App.2d 34, 38 [43 Cal. Rptr. 105] no opinion is expressed upon the propriety of conducting an authorized search for weapons in this manner. (See People v. Mickelson (1963) 59 Cal.2d 448, 450 [30 Cal. Rptr. 18, 380 P.2d 658].)
[*] A hearing was granted by the Supreme Court on May 26, 1965.
[2] The manner in which the witness as a possible accomplice was held and examined cannot be condoned. It might well bring into play the questions of first, whether her statements, if they had been more incriminating, were voluntary; and, secondly, even if voluntary whether they were tainted because of failure to advise her of her right to counsel or right to remain silent. (See People v. Underwood (1964) 61 Cal.2d 113, 122-125 [37 Cal. Rptr. 313, 389 P.2d 937]; and People v. Dorado, supra, 62 Cal.2d 338, 345-357.)
[3] This account is as follows: "A. Well, he said that at the time of the arrest he was nervous and that he thought the officers had already assumed him guilty, and he knew that he was in big trouble so he wanted to keep as much out of trouble as he could and so he dreamed up this story. Q. What did he tell you with respect to his presence in that location or did he tell you? A. Well, he told me that July of the previous year, 1962, he had gone down to Los Angeles and he had gotten into a fight down there. Rather he had gone to an after-hours place and a lady asked him for a ride home, a lady by the name of Ella, and when he got to her home her husband was there and he became annoyed and a brief fight ensued in which the defendant knocked this person down. The defendant left and then he states that on a Thursday prior to the robbery a fellow by the name of Howard came to the apartment on Poco Lane and said that this person he had struck down in L.A. was very annoyed with him, that he would see him in jail. At that time he said that he would buy some beer if Mr. Hanamoto would go after it. So he gave Mr. Hanamoto some money and the keys to a car which was that Pontiac. Mr. Hanamoto went down and got some beer and brought it back to the apartment and gave the keys back to this Howard. Q. This was on a Thursday? A. Thursday prior to the robbery, and Howard left shortly thereafter and stated that Ella would like to see him at the Moonlite Bowl the following day, Friday. So Mr. Hanamoto said, okay, he'd be there. He had Mrs. Shepherd give him a ride out to the Moonlite Bowl, and he was met at the door by Mr. Howard who stated that they must have exchanged coats by mistake the previous night. So he gave him Mr. Hanamoto's coat back to him  correction  no, there was no discussion on the exchange of coats. Mr. Howard apparently had Mr. Hanamoto's coat, and he told Mr. Hanamoto to wait there while he went to get Ella and that he'd be right back. Mr. Hanamoto waited for some time and when Howard didn't show up with Ella, Mr. Hanamoto started walking around the area and at that time he was picked up by the police."