[Crim. No. 18246. Second Dist., Div. Two. Apr. 13, 1971.]

THE PEOPLE, Plaintiff and Appellant, v.
DANIEL MICHAEL ROSENFELD, Defendant and Respondent.

**COUNSEL**

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, Evelle J. Younger, District Attorney, Harry Wood and Donald J. Kaplan, Deputy District Attorneys, for Plaintiff and Appellant.

Richard S. Buckley, Public Defender, James L. McCormick, Mark Overland, Leighton A. Nugent and Harold E. Shabo, Deputy Public Defenders, for Defendant and Respondent.

**OPINION**

**FLEMING, J.**—People appeal an order suppressing evidence and dismissing the information against defendant. (Pen. Code, § 1238, subd. (7).)

During the hearing on defendant's motion to suppress (Pen. Code, § 1538.5), Officer Joseph Toney of the Los Angeles police testified that he and his partner were patrolling an alley behind apartment buildings with open garages in an area of Hollywood where there had been "quite a few burglaries from motor vehicles." About 9 p.m. they saw defendant

walk out from behind two buildings and look in the direction of the police vehicle. He then turned and walked back between the buildings. Toney's on-the-scene interpretation of this event was, according to his testimony:

". . . It appeared to me as if the defendant was attempting to avoid any type of contact with us."[1]

The officers called defendant to their vehicle. Officer Toney asked him what he was doing there, and defendant said that he was looking for a friend named Dave. When asked where his friend lived, defendant said he didn't know. A pat-down of defendant revealed no weapons or tools. Toney asked for identification, and defendant produced a California driver's license. At this point Toney's partner walked over between the buildings, and Toney directed defendant to stand to the rear of the police vehicle on the driver's side. During the hearing the trial judge asked of Toney why he had not, at this juncture, released defendant. Toney replied as follows:

"A. It's a known area of burglaries from motor vehicles. It's an alley-way, and there is a lot of garages, open garages, so we felt that the defendant might have been trying to break into the cars, so we held him there for further investigation until we could check the area out and see if we could find his friend Dave."

Toney also testified that although he did not have any specific crime in mind, he decided to run a "want check" on defendant while his partner was checking the area and that, as he put his head and arm into the police vehicle to use the radio speaker, he saw defendant take his right hand out of his jacket pocket and throw a "plastic substance" over the rear trunk of the police car. At this moment Toney's partner was absent, and he thought it best for his own safety to handcuff defendant and place him in the police vehicle. With a flashlight Toney then searched the ground and found a plastic bag containing marijuana.

Defendant was thereupon arrested and charged with possession of marijuana.

■ The initial detention of defendant was lawful. The officers were faced with the following facts: (1) it was 9 p.m. and therefore dark; (2) the location was an alleyway with many open garages which provided opportunity for the commission of car burglaries; (3) car burglaries had

---

[1]Toney was in uniform. The transcript of the preliminary hearing shows that he and his partner were on patrol in a black-and-white marked police vehicle, which was stopped in the alley with its headlights off. The transcript additionally indicates that when they first saw defendant he was walking out of a garage where vehicles were parked.

recently occurred with great frequency in the vicinity; (4) when defendant saw the police vehicle, he reversed his approach into the alley and headed for the area between buildings from which he had just emerged.

We are mindful, particularly in relation to the fourth factor, of our Supreme Court's recent admonition that the ". . . law requires more than a mere 'furtive gesture' to constitute probable cause to search or to arrest." (*People* v. *Superior Court* (*Kiefer*) 3 Cal.3d 807, 818 [91 Cal.Rptr. 729, 478 P.2d 449].) No one of the four factors alone would have justified the initial detention. ■ The mere act of turning one's back on a police officer, even though to the officer the action seems to be a "nervous" one, is insufficient to justify detention. (*People* v. *Moore,* 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800].) We are, however, unprepared to say that the initial detention at bench was based on mere hunch. Notwithstanding defendant's claim that the hour of 9 p.m. is "conventional," it is night-time, and although 9 p.m. is a conventional hour it serves just as effectively to hide criminal activity as does 11 p.m. or 2 a.m. ■ Darkness is a pertinent circumstance in determining the propriety of a temporary, nonconsensual detention by the police. (*People* v. *Cruppi,* 265 Cal.App.2d 9, 12 [71 Cal.Rptr. 42]; *People* v. *Henze,* 253 Cal.App.2d 986, 989 [61 Cal.Rptr. 545].) Darkness, together with furtive conduct (*Williams* v. *Superior Court,* 274 Cal.App.2d 709, 712 [79 Cal.Rptr. 489]), the high potential for the particular crime suspected (*People* v. *Manis,* 268 Cal.App.2d 653, 660 [74 Cal.Rptr. 423]), the open garages, and the known high rate of thefts from open garages, furnished sufficient reason to warrant temporary detention for investigation. While there is sometimes a delicate balance in the necessary process of accommodation between an individual's right to privacy and ". . . the urgent need of society in these troubled times . . . for prompt and effective police detection of crime" (*People* v. *Woods,* 6 Cal.App.3d 832, 835-836 [86 Cal.Rptr. 264]), the facts at bench justified the police in temporarily detaining defendant.

After the initial detention defendant fortified the objective suspicions of the police by stating he was in the neighborhood looking for Dave but did not know where Dave lived. Standing alone, such a remark would not necessarily be deemed evasive, but under the circumstances previously detailed it would be surprising if the officers accepted defendant's ingenuous statement as a full explanation for his appearance in, and retreat from, the dark alley they were patrolling. Toney's partner was properly and sensibly discharging his duties when he went between the buildings to see if he could find Dave, since in all probability Dave's presence would have cleared defendant of suspicion of wrongdoing.

This point is buttressed by reasonable inferences. The trial judge observed that in his view, Toney's "want check" was in fact a method of ". . . killing time until his buddy [Toney's partner] came back and reported whether he had found any cars broken into, or anything that looked like someone might be breaking in, and the defendant might be a lookout. Something along those lines. I think the record check was just something to keep both people busy while the officer came back and reported, 'No, there's nothing going on there.' " If we accept the trial court's evaluation of the testimony relating to this issue (*People* v. *Superior Court* (*Kiefer*) *supra*, 3 Cal.3d at p. 828), it is apparent that what the officers were attempting to do was carry out an on-the-scene investigation in a high crime rate area of the activities of a person who they suspected might be breaking into parked vehicles. It is a reasonable inference that the officers were attempting to *prevent* the commission of a crime by a timely investigation of brief duration. (*Terry* v. *Ohio*, 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868]; see generally, *People* v. *Woods*, *supra*, 6 Cal.App.3d 832, 837.) Under these circumstances we think the discovery in a deserted alleyway at night of a person declaredly searching for a mysterious stranger named Dave whose address he did not know warranted further on-the-scene investigation together with further temporary detention for a brief period.

■ We therefore reject the legal conclusion the trial court apparently reached on the basis of the facts before it.[2] The duration of the further investigation was admittedly short, and the extent of the additional temporary detention was minimal. On the facts before us we believe the officers acted within their authority. Unlike *People* v. *Lingo*, 3 Cal.App.3d 661 [83 Cal.Rptr. 755], and *Pendergraft* v. *Superior Court*, 15 Cal.App.3d 237 [93 Cal.Rptr. 155], where a lawfully initiated detention was unlawfully extended, the officers at bench had not completed their initial on-the-scene investigation. Prudence dictated that at a minimum the police examine the nearby vehicles and buildings for signs of unlawful entry or attempted unlawful entry. Toney's partner was in the process of doing this when defendant irremediably incriminated himself by jettisoning his contraband.

Since the detention in its entirety was lawful, the seizure of the marijuana did not come about as the result of a search, and was itself lawful.

---

[2]Immediately prior to its ruling, the trial court inquired of the deputy district attorney what the legal basis for defendant's detention was after he had been patted down and found to be "clean." After the deputy's argument, the trial court declared that there was some doubt in his mind (presumably as to the legality of the *extended* detention) and that he was gong to resolve that doubt in defendant's favor.

(*Hester* v. *United States,* 265 U.S. 57, 58 [68 L.Ed. 898, 899, 44 S.Ct. 445].)

The order setting aside the information is reversed.

**HERNDON, J.**—I concur in the opinion and offer only brief additional comment.

In *Rios* v. *United States,* 364 U.S. 253 [4 L.Ed.2d 1688, 80 S.Ct. 1431], the relevant facts are recited as follows:

"At about ten o'clock on the night of February 18, 1957, two Los Angeles police officers, dressed in plain clothes and riding in an unmarked car, observed a taxicab standing in a parking lot next to an apartment house at the corner of First and Flower Streets in Los Angeles. The neighborhood had a reputation for 'narcotics activity.' The officers saw the petitioner look up and down the street, walk across the lot, and get into the cab. Neither officer had ever before seen the petitioner, and neither of them had any idea of his identity. Except for the reputation of the neighborhood, neither officer had received information of any kind to suggest that someone might be engaged in criminal activity at that time and place. They were not searching for a participant in any previous crime. They were in possession of no arrest or search warrants.

"The taxicab drove away, and the officers followed it in their car for a distance of about two miles through the city. At the intersection of First and State Streets the cab stopped for a traffic light. The two officers alighted from their car and approached on foot to opposite sides of the cab. One of the officers identified himself as a policeman. In the next minute there occurred a rapid succession of events. The cab door was opened; the petitioner dropped a recognizable package of narcotics to the floor of the vehicle; one of the officers grabbed the petitioner as he alighted from the cab; the other officer retrieved the package; and the first officer drew his revolver."

The decision of the Supreme Court of the United States holds in effect that the officers' two-mile pursuit of the cab and their act in approaching and detaining the vehicle for purposes of "routine interrogation" were proper. In remanding the case to the District Court for further proceedings, the court declared as follows: "The validity of the search thus turns upon the narrow question of when the arrest occurred, and the answer to that question depends upon an evaluation of the conflicting testimony of those who were there that night."

In *People* v. *Cowman,* 223 Cal.App.2d 109 [35 Cal.Rptr. 528], a case involving a similar factual situation, we discussed *Rios* v. *United*

*States, supra,* and a number of other decisions of the state and federal courts wherein the actions of police officers in detaining suspects for purposes of investigation were held proper notwithstanding that the attendant circumstances were not sufficiently suspicious to provide probable cause to arrest. In the light of this review we commented as follows at pages 117-118: "The rationale of all these decisions is that an officer of the law, employed to maintain the peace and to prevent crime, as well as to apprehend criminals after the fact, has both the right and the duty to make reasonable investigation of all suspicious activities even though the nature thereof may fall short of grounds sufficient to justify an arrest or a search of the persons or the effects of the suspects. Experienced police officers naturally develop an ability to perceive the unusual and suspicious which is of enormous value in the difficult task of protecting the security and safety of law-abiding citizens. The benefit thereof should not be lost because the cold record before a reviewing court does not contain all the particularized perceptions which may have been so meaningful at the scene."[1]

**ROTH, P. J.**—I dissent.

The minutes recite that the trial court granted a motion "as a matter of law" suppressing the evidence,[1] and dismissed the case because of a lack of evidence to support the prolonged detention during which the suppressed evidence was obtained. The People appeal.

The court addressing counsel said: ". . . defendant got out his identification, they patted him down, no tools, nothing that appeared to be loot, what gives him [the officer] the right to *further* detain him?" (Italics added.) It appears that the trial court accepted the original detention as proper. It suppressed the evidence and dismissed the case because it was satisfied that "police instinct" (see *infra*), triggered by the objective circumstances recited by the majority, which circumstances provided the basis for the original detention, should have been completely "satisfied as a matter of law" when defendant was patted down and when he thoroughly identified himself.

Accepting for the purpose of this dissent, as the trial court did, the propriety of the original detention, which is in and of itself subject to doubt, the trial court had the defendant, Toney, and all the evidence

---

[1]*People* v. *Cowman, supra,* is cited with approval in *People* v. *Superior Court (Kiefer)* 3 Cal.3d 807, at page 827 [91 Cal.Rptr. 729, 478 P.2d 449].

[1]In light of the unfavorable outcome, in terms of the People's case, it deserves emphasis that the only evidence offered at the hearing was Officer Toney's.

before it and then proceeded, by its order, to suppress the evidence obtained *after* defendant had been frisked and *after* he had identified himself.

The duty of determining questions of fact in a proceeding conducted pursuant to section 1538.5 of the Penal Code is for the trial court. The rulings of the trial court will not be disturbed on appeal if there is substantial evidence to support them. (*People* v. *Superior Court,* 3 Cal.App.3d 476, 488 [83 Cal.Rptr. 771]; accord *People* v. *Garnett,* 6 Cal.App.3d 280, 289 [85 Cal.Rptr. 769] [resolution of conflicts in testimony a matter for the trial court].) If the trial court is charged with the responsibility of determining questions of fact, it cannot be stripped of the concomitant power to draw inferences from the evidence which is presented. (Cf. *People* v. *Superior Court,* 3 Cal.3d 807, 828 [91 Cal.Rptr. 729, 478 P.2d 449].) At bench there is substantial evidence to support the trial court's ruling and ". . . due deference to the trier of fact's determination of the weight and credibility of the testimony . . ." (*Id.* at p. 828) should lead to an affirmance of the order.[2]

The record shows it was 9 p.m. and dark. Defendant walked out "from between two buildings" and "looked in the direction of the police car" then "turned and walked back between the two buildings." The officers called defendant and "told him to come over to the car." He did. In the ensuing conversation defendant told the officers he was looking for Dave, but when queried where Dave lived "he said he didn't know." The officers then proceeded with a pat-down search and Toney made clear that he felt nothing like a weapon or any type of tool or anything that might be used to burglarize a car. Concurrently, and it is fair to assume in response to Toney's request, defendant produced his California operator's license. After the patdown and identification, Toney's partner "went between the buildings" and Toney ordered defendant to "stand to the rear of the vehicle on the driver's side." According to Toney, the neighborhood was "a known area of burglaries for motor vehicles."

As to his subjective interpretation of the described events and acts, Toney testified: "I thought [defendant] might be a burglar"—"it appeared

---

[2]We are not unmindful of *People* v. *Beasley,* 5 Cal.App.3d 617 [85 Cal.Rptr. 501] which holds that a minute order entered under Penal Code section 1385 should state specifically the reasons for a dismissal. However, in *Beasley,* the dismissal was in the "interests of justice." At bench, the minute order is "as a matter of law" and the reporter's transcript specifically shows that the trial judge did not consider the evidence sufficient to justify further detention. The reporter's transcript shows that the district attorney specifically asked the court "Is this as a matter of law . . ." and that the court replied: "As a matter of law, yes." It appears that the court entered an order of dismissal under Penal Code section 1385 to afford the district attorney an immediate opportunity to test its order suppressing the evidence under 1538.5. (*People* v. *Superior Court,* 271 Cal.App.2d 338 [76 Cal.Rptr. 712].)

to me as if the defendant was attempting to avoid any type of contact with us" and then in response to the prosecution's questions: "Would you just kind of call that police instinct?" Toney replied: "Yes."

Nothing in the record shows that there was not a well defined proper. walk-way between the two buildings which the defendant would have had every "right" to use. Similarly, there is no evidence at all respecting any of the several factual issues: we do not know whether the police car was parked 10 or 100 feet from the spot at which defendant first appeared before he retraced his steps—in the dark; we do not know what defendant's intentions were in terms of ever even entering the alley; and Toney's conclusion, with nothing to fortify it, that the defendant saw the police car[3] and thereupon attempted to avoid contact with the officers, is nothing but opinion based on "hunch" or "instinct."

We have nothing before us respecting defendant's appearance, age or demeanor—factors normally considered important in a detention of this kind. Nor, of course, is there a suggestion that a crime had been recently committed, or that a prowler had been reported, other than Toney's statement that this was a "known area" for car burglaries, generally.

Finally, we are not told by the record *how* the defendant reversed the direction of his walk. Obviously, this hiatus is critical since a furtive or hurried retreat would certainly have justified prompt investigation by the police.

What the record does tell us, however, is that the defendant promptly and willingly responded to the orders of the police to come over to the squad car; that he produced valid identification; that he answered every question addressed to him; that he submitted to a frisk; and that he cooperated with the officers in every way.

Defendant's inability to supply Dave's address apparently was one of the circumstances which led the trial court to believe that the original detention was proper. In none of the facts recited, however, including defendant's failure to supply Dave's address, did the trial court nor do I discern anything that could legitimately excite "police instinct" to prolong the detention beyond the actual stop and frisk plus the concurrent identification.

To catalogue all that we do not know about the circumstances of this prolonged detention is to compile a checklist of factors normally underlying a valid detention and arrest. On the dispositive issue of the length of detention we have solely the argument of the prosecution and absolutely no evidence other than such as can be derived by pyramiding inferences.

---

[3]Significantly, Toney's testimony that he "saw" the police car was stricken and he was only allowed to state that the defendant looked in the squad car's direction.

To justify the prolonged detention at bench would, in my opinion, extend the limited right to stop and frisk defined in *Terry* v. *Ohio,* 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], and *Sibron* v. *New York,* 392 U.S. 40 [20 L.Ed.2d 917, 88 S.Ct. 1889], to the plenary power of the police found only in a police state. The test of the lawfulness of the *duration* of a temporary detention is whether it extended beyond the time reasonably necessary under the circumstances to carry out the initial purpose of the detention. (*Willet* v. *Superior Court,* 2 Cal.App.3d 555, 559 [83 Cal.Rptr. 22]; accord, *Pendergraft* v. *Superior Court,* 15 Cal.App.3d 237, 242 [93 Cal. Rptr. 155].) The trial court found, in terms of the facts before it, that the prolonged detention was not justified.

This finding is buttressed by the considered judgment of the trial judge which is entitled to due deference and which should be affirmed if there is substantial evidence to support it. (*People* v. *Superior Court, supra,* 3 Cal. App.3d 476, 488.)

Whenever any citizen anywhere is stopped by two policemen for what may objectively appear to a reasonable man to be good reasons, it is an unequal encounter. When a citizen is stopped by two policemen for admittedly no reason other than "police instinct" it's questionable whether he should be stopped at all for the very reason demonstrated. No "police instinct" can justify a detention prolonged on the hope *that the detention itself* will turn something up, even if, in the course of events, it should happen to do so.

I would affirm the order.

Respondent's petition for a hearing by the Supreme Court was denied June 9, 1971.