[Crim. No. 933. Fifth Dist. Aug. 13, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL PAUL GONSOULIN et al., Defendants and Appellants.

## COUNSEL

Eugene A. Mash, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Doris H. Maier, Assistant Attorney General, Arnold O. Overoye and Michael Franchetti, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GARGANO, J.**—Appellants, Michael Paul Gonsoulin and Edward Andrus, codefendants in the court below, were charged with one count of possession of a narcotic for sale in violation of Health and Safety Code

section 11500.5, one count of possession of a narcotic in violation of Health and Safety Code section 11500, and one count of possession of devices for injecting narcotics in violation of Health and Safety Code section 11555; they entered pleas of not guilty on all counts. Appellants then moved to suppress the evidence pursuant to Penal Code section 1538.5, and their motions were denied. Appellants changed their pleas to guilty on the count involving possession of a narcotic, and the remaining counts were dismissed. Their appeals from the judgments entered on the pleas of guilty are authorized by section 1538.5.

On January 29, 1970, appellants and one Chester Herschel Carter, a Marine stationed at Camp Pendleton, were riding in Carter's Pontiac on Highway 5 near Cottonwood Road, northwest of Los Banos, California, when the vehicle was stopped by Officers Thurman and McCullough of the Highway Patrol; Gonsoulin was driving, Carter was seated in the right front seat, and appellant Andrus was seated in the back seat. Officer Thurman testified that he stopped the automobile because the rear license plate was smudged, obscuring the state of origin and some of the numbers; he said he radioed McCullough to back him up because there were three subjects in the automobile.

Officer Thurman approached on the driver's side and asked Gonsoulin for his driver's license and for the car's registration; Gonsoulin produced a temporary California driver's license which had expired. Carter told the officer that he had recently purchased the vehicle in Minnesota and produced the sales contract and an insurance policy. The contract accurately described the automobile and contained an identification number matching the identification beneath the Pontiac's windshield on the left side.[1] Then appellant Gonsoulin stepped out of the vehicle, and at Officer Thurman's request for additional identification removed his draft card from his wallet; the card identified Gonsoulin by certain tattoo marks on his left shoulder; these marks were viewed by Thurman.

As Gonsoulin was looking through his wallet, Officer Thurman noticed that he had a Standard Oil Company credit card issued in the name of "Curtis Reed."[2] Thurman asked appellant where he got the credit card, and appellant said that a friend had lent it to him to use on the trip. The

---

[1]Carter testified that the bill of sale indicated the license number of the vehicle and that the license tax and the registration fees had been paid.

[2]At this point we find a sharp conflict in the testimony. Thurman testified that he was looking over Gonsoulin's shoulder, and he saw the card as the latter was thumbing through his wallet. On the other hand, Gonsoulin testified that the officer ordered appellant to remove his money from the wallet and to hand the wallet to Thurman. He said Officer Thurman saw the credit card as he was examining the contents of the wallet.

officer asked Gonsoulin if he would object to driving south on Highway 5 to a Standard Station in Santa Nella so that the card could be "checked." Appellant consented, got in the Pontiac, turned it toward the direction from which he had come, and under police escort drove the car to the service station, a distance of about seven miles; McCullough's patrol car led the procession while Thurman, in his police vehicle, took a position at the rear.[3]

On the way to the service station Thurman observed appellant Andrus making several motions toward the floor of the car. Fearing that Andrus was acquiring a weapon from the vehicle, Thurman radioed his observations to McCullough, and the officers decided to make a pat down search. At the service station the officers asked the attendant to check the credit card with the main office and were subsequently informed that the card was not to be honored. They also asked the three suspects to get out of the car and searched them for weapons. Thurman saw Andrus throw an object under the Pontiac, and because Andrus appeared to be under the influence of narcotics the officer stooped down and picked it up; the object was a small glass dripper with a rubber bulb at one end. Through the open door of the automobile Thurman saw another dripper lying on the right rear floorboard; it appeared to have fresh blood upon it. In the middle of the rear seat was an eyeglass case with another dripper protruding from it. The officers placed appellants and Carter under arrest and called the sheriff's office. Deputies from the sheriff's office searched the automobile and found heroin and narcotic paraphernalia.

■ The provocation required to permit a police officer to stop a vehicle and to temporarily detain the driver for questioning is not the same as that required for a valid arrest or a lawful search (*People* v. *Mickelson,* 59 Cal.2d 448, 454 [30 Cal.Rptr. 18, 380 P.2d 658]). ■ Once a vehicle has been legitimately stopped for an infraction, the officer may detain it and its occupants for such period of time as is necessary to issue a citation, to determine whether the driver has a valid driver's license and to investigate the vehicle registration (*People* v. *Lingo,* 3 Cal.App.3d 661 [83 Cal.Rptr. 755]; Veh. Code, § 2800 et seq.). But the detention of a motorist whose vehicle has been properly stopped is not without constitutional limitation. ■ Thus, while circumstances short of probable cause may justify the stopping of a vehicle, before an officer may detain a motorist "for questioning by means of physical force or a show of authority, he 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. . . .' " (*Cunha* v. *Superior Court,* 2 Cal.3d 352, 355-356 [85 Cal.Rptr. 160, 466

---

[3]Here again we find a sharp conflict in the testimony. Officer Thurman testified that he asked Gonsoulin if he had any objection to driving to the service station, but Gonsoulin said he was given no choice in the matter.

P.2d 704]; *Pendergraft* v. *Superior Court,* 15 Cal.App.3d 237 [93 Cal.Rptr. 155].) Unusual activity alone, unless there is some suggestion that it is related to criminality, is insufficient to warrant prolonged detention (*People* v. *Henze,* 253 Cal.App.2d 986 [61 Cal.Rptr. 545]). Our Supreme Court, in *Irwin* v. *Superior Court,* 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12], stated the rule as follows:

". . . detention based on 'mere hunch' is unlawful [citation] even though the officer may have acted in good faith [citation]. There must be a 'rational' suspicion by the peace officer that some activity out of the ordinary is or has taken place . . . 'some suggestion that the activity is related to crime.' "

With these principles in mind, we believe that while the stopping of Carter's automobile may not, of itself, have been improper or the subsequent investigation of the vehicle's ownership and Gonsoulin's identity unlawful, the officer's conduct, both before and after he stopped the vehicle, gives credence to appellants' argument that Thurman was on a "fishing expedition" from the very beginning and compels the conclusion that the officers forced Gonsoulin to drive someone else's Pontiac, and all of its occupants, back in the direction from which it had come, a distance of seven miles, on the mere hunch that the three Negro suspects he had seen driving on the highway were engaged in some criminal activity.

Thurman testified that the rear license plate was smudged, but, significantly, the smudging was apparently road-caused and no citation was issued for that alleged infraction. Thurman followed Carter's Pontiac for about 11 miles without making any attempt to ascertain if the front license plate was also smudged in order to determine whether the smudging was intentional; he also testified that as he followed the car he observed no law being broken. It can hardly be said that the usual practice employed by the California Highway Patrol in stopping vehicles for minor equipment infractions was followed in this case; Thurman drove his patrol car across the highway in front of the vehicle, and McCullough drove up and blocked it from behind. When Thurman asked Gonsoulin to drive to Santa Nella, the investigation of the equipment infraction, of the vehicle's ownership and of the driver's identity[4] had, for all intents and purposes, been completed; Thurman had seen the contract of sale, the insurance policy Carter had obtained for the Pontiac and Gonsoulin's draft card, plus the identifying tattoo marks on his shoulder. Thurman admitted that he could have had the credit card checked via radio.

We hold that Officer Thurman's request to appellant Gonsoulin to drive

---

[4]A "fix-it" citation for Gonsoulin's lack of an unexpired license was not issued, by the officers until after they had searched the car at the service station.

Carter's automobile, under police escort, to the Standard Station in Santa Nella, was unreasonable and amounted to an arrest without probable cause. To uphold the detention in this case would condone unwarranted police intrusion and invite prolonged detention of law-abiding citizens on mere hunches.

The Attorney General suggests that the seven-mile return to the Standard Station in Santa Nella for the investigation of the credit card was justified, because the officer had good reason to suspect that it was stolen.[5] We do not agree. In this credit card age, the use of someone else's credit card with the owner's knowledge and consent is not an unusual circumstance, nor can it be assumed that such possession, alone, is related to criminal activity. In fact, if such possession were to be considered indication of a crime, the flow of credit card commerce would be greatly affected.

Even if we should assume that Gonsoulin's possession of the credit card was of a suspicious circumstance, Officer Thurman's request that he drive the vehicle to Santa Nella was unreasonable. Gonsoulin was driving a vehicle which had been satisfactorily identified, and he had provided convincing proof of his own identity. Thurman admitted that he could have had the credit card checked by radio; consequently, if the vehicle had been permitted to leave and a subsequent investigation by radio had disclosed that the credit card was stolen, it would have been relatively easy for the police to apprehend appellant Gonsoulin; the license number of the vehicle, the complete description of the car and the name and identification of the driver of the automobile were known to the police officers; they also knew the name of the owner of the vehicle and the military base where he was stationed.

The Attorney General argues that the officers did not unlawfully detain appellants, because Gonsoulin consented to drive the vehicle to the service station. It is unrealistic to believe that Gonsoulin had any choice in the matter. He was asked, under an impressive display of police authority, if he had any objection to driving to Santa Nella; one police car was parked in front of Carter's Pontiac and the other behind. Officer Thurman stated that he did not believe Gonsoulin's explanation that he borrowed the credit card, and his testimony unequivocally indicates that he would have arrested the suspect if he had objected. Appellant was forced to drive the Pontiac to Santa Nella under police escort, with Officer McCullough leading the procession and Officer Thurman bringing up the rear.

The case of *People* v. *Lingo, supra,* 3 Cal.App.3d 661, 664, while distinguishable, is authoritative. In that case the police stopped a vehicle be-

---

[5]The record does not indicate why the credit card was not to be honored.

cause it did not have a rear license plate. As here, the driver, one Larry Morley, had an expired driver's license. When questioned about ownership, defendant, who was riding in the automobile, produced a registration certificate from Colorado in another person's name and stated that he was the owner and was in the process of securing a transfer of the title documents. Then the officers saw a phonograph and a portable radio in the car, and suspecting possible criminal origin of these objects, asked defendant if there were any narcotics in the automobile. When defendant answered in the negative, the officer asked permission to search the vehicle. Defendant consented, and the officers found a box containing marijuana. Holding that the search was unlawful, Justice Kingsley, speaking for a unanimous court, had this to say:

"We do not deal here with temporary detention based on some actual and legitimate suspicion that the person detained might be engaged in the offense inquired about, we do not deal with a temporary detention of a person legitimately supposed to possess information useful in the investigation of a particular offense, we do not deal with a case of interrogation during a detention still lawfully continuing for some other reason, and we do not deal with a case (if such a case be possible) of a mere inquiry not involving a detention. We deal only with the situation disclosed by the record before us, namely a detention unlawfully continued after any lawful purpose had passed and therefore imposed solely for the purpose of asking a question based either on pure hunch or on mere routine police practice. Once the officers here had detained defendant beyond the time necessary to perform their legitimate functions, he was illegally detained and his status was the same as that of the defendant in *People* v. *Moore* (1968) 69 Cal.2d 674 [72 Cal.Rptr. 800, 446 P.2d 800], where the Supreme Court held that interrogation and a request to submit to a search, during a detention not based on any legitimate grounds, was unlawful and barred the use of the information thus secured."

██ Because the initial detention was improper, the evidence obtained from the search at the service station was not admissible. (*People* v. *Moore,* 69 Cal.2d 674, 683 [72 Cal.Rptr. 800, 446 P.2d 800].) The evidence was arrived at by exploitation of that earlier illegality. (*Wong Sun* v. *United States,* 371 U.S. 471, 487, 488 [9 L.Ed.2d 441, 455, 83 S.Ct. 407]; *People* v. *Bilderbach,* 62 Cal.2d 757, 766 [44 Cal.Rptr. 313, 401 P.2d 921].)

The judgment is reversed.

Stone, P. J., concurred.

A petition for a rehearing was denied September 10, 1971.