[Crim. No. 18430. In Bank. Oct. 7, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
MARK LEE HARRIS, Defendant and Appellant.

**COUNSEL**

Joseph Shemaria, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Gary R. Hahn, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**RICHARDSON, J.**—Defendant was charged with burglary (Pen. Code, § 459). His motion to suppress evidence (Pen. Code, § 1538.5) was denied. After a jury trial, he was found guilty of first degree burglary and placed on probation. He appeals from the judgment of conviction, asserting that the motion to suppress should have been granted. We have concluded that the motion was improperly denied and that the judgment must be reversed.

The victims, Mr. and Mrs. Marx, were the sole occupants of a residence at 449 South McCadden Place, Los Angeles. They left their home one Saturday evening at 7 p.m. and returned about 10:15 p.m. Mr. Marx parked their car in the driveway and, as they approached the front door of the residence, they heard a noise which indicated to them that someone was inside. The Marxes returned to their car and drove to a neighbor's home to call the police. Finding no one at home, the Marxes then drove to another nearby residence and asked the occupant to

summon the police. While there, they observed a car stop in front of their home. The driver stepped out of the vehicle and wiped its front and rear windows. Mr. Marx, believing that such activity was unusual and that there might be a connection between the driver and the person suspected of being inside his home, backed his car out of the neighbor's driveway and drove up behind the unknown car. Mrs. Marx copied the license number of that car. The other driver then drove away.

The police arrived at the Marx home at approximately 10:30 p.m. The Marxes gave the officers the license number of the car they had observed and the following description of the person they had seen in front of their home: male Caucasian, dark hair, moustache, about 5 feet 8 inches tall, about 150 pounds, wearing a light cardigan sweater and dark trousers.

Among the arriving police were Officers Ryan and Snee who were given by the officer in charge a description of the suspect who had been seen in front of the residence. They also were told of the possibility that a second suspect was inside the Marx residence. The officer in charge further informed Ryan and Snee that he had heard dogs barking in succession in a northerly direction suggesting the possibility that someone was headed on that course.

Officers Ryan and Snee proceeded north on Highland, a street which runs parallel to, and a block west of, McCadden, and continued north two blocks to the intersection of Highland and Third Street. The area was residential. Shortly thereafter, at approximately 11 p.m., they observed defendant and a male companion crossing Highland, westbound on Third Street, approximately three blocks from the Marx residence. The physical appearance of defendant and his clothing approximated the description furnished to the officers.

The suspects were stopped and interrogated separately. Defendant stated that he was looking for a girl named Donna who lived on McCadden Place. His companion said they had taken a bus to Highland and Wilshire—several blocks south of Third—and had been walking from the bus stop looking for a restaurant. Officer Ryan knew that there was a restaurant at Wilshire and Citrus, about 300 feet west of the bus stop. Both defendant and his companion appeared nervous.

The suspects were searched, handcuffed and placed in the back of the police car. Without asking the suspects' consent, Officers Ryan and Snee then drove the suspects back to the Marx residence for possible

identification by the Marxes, who were unable, however, to identify either suspect as the man they had observed in front of their home that evening.

While Officers Ryan and Snee continued their interrogation of the suspects, other officers discovered that someone had apparently entered the house through the service porch window by climbing on top of a dusty teacart. A footprint of a ripple-soled shoe bearing the words "Neoprine" and "Oil Resistant," was observed in the dust. Immediately after the Marxes failed to identify either suspect as the man they had observed in front of their home, a police sergeant noticed that defendant's shoe was ripple-soled. An officer removed defendant's shoe, took it to the teacart, and visually matched it with the shoeprint in the dust. Defendant and his companion were then formally placed under arrest.

Further police investigation revealed that the burglar or burglars had removed some change from a "piggy" bank in the Marx residence, as well as a folded $10 bill and a $1 silver certificate, both of which had been deposited before the burglary in Mrs. Marx' jewelry box. An inventory search conducted incident to the suspects' booking subsequently disclosed a $1 silver certificate in defendant's wallet and a folded $10 bill in his companion's wallet.

Defendant, contending that his detention and subsequent conveyance to the Marx residence were unlawful, moved to suppress the currency together with evidence of the matching shoeprint. The motion was denied and the evidence (shoeprint and paper currency) introduced at trial formed the major basis for defendant's conviction.

1. *The detention.*

■ Although defendant contends otherwise, the officers had sufficient cause to detain defendant for initial questioning. ■ It is well established that a temporary detention may be justified by circumstances falling short of probable cause to arrest a suspect. (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) In amplification of this principle we recently explained, "[a] police officer may stop and question persons on public streets, . . . when the circumstances indicate to a reasonable man in a like position that such a course of action is called for in the proper discharge of the officer's duties. [Citations.] The good faith suspicion which warrants an officer's deten-

tion of a person for investigative reasons is necessarily of a lesser standard than that required to effect an arrest. [Citation.] Where there is a rational belief of criminal activity with which the suspect is connected, a detention for reasonable investigative procedures infringes no constitutional restraint. [Citation.]" (*People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353]; see *People* v. *Gale* (1973) 9 Cal.3d 788, 797-798 [108 Cal.Rptr. 852, 511 P.2d 1204]; *Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 426-427 [82 Cal.Rptr. 484, 462 P.2d 12].)

The foregoing standard for *detention* is of lesser degree than that applicable to an *arrest.* ▇ Cause for arrest exists when the facts known to the arresting officer "would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." (*People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961]; *People* v. *Ross* (1967) 67 Cal.2d 64, 69-70 [60 Cal.Rptr. 254, 429 P.2d 606]; *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) ▇ The People concede that the circumstances were insufficient to furnish reasonable cause to *arrest* the suspects. However, in the instant case, the circumstances did disclose a reasonable possibility that defendant and his companion were involved in the burglary. These circumstances included their presence in a residential area at 11 p.m., and the general similarity between defendant's appearance and the Marx' description of one of the suspects, thus meeting the requisite but lesser detention standards of "good faith suspicion," and "rational belief of criminal activity" expressed by us in *Flores.* The initial *detention* and questioning were entirely proper. (See *People* v. *Watson* (1970) 12 Cal.App.3d 130, 134-135 [90 Cal.Rptr. 483].)

## 2. *The transportation.*

▇ The principal difficulty in the matter before us arises from the police conduct following the detention when circumstances known to the police placed the case in that gray area in which the facts justify measures beyond detention but short of arrest. As we have noted, after questioning defendant and his companion the officers were presented with additional facts pointing to the suspects' possible involvement in the burglary, namely, their somewhat contradictory explanations regarding their presence in the neighborhood, and their nervous appearance. At that time the investigation imperceptibly entered a new stage. Suspicion was deepening. The officers fairly entertained growing doubts as to the veracity of defendant and his companion. The People urge that, at this

point, despite the continued lack of reasonable cause to arrest the suspects, the officers properly could transport them to the scene of the crime for possible identification by the Marxes.

The propriety of such an in-the-field transportation of suspects prior to arrest poses the principle issue in the case. Here lies the pressure point between the individual's right of liberty and personal freedom, sanctified by the Fourth Amendment, on the one hand, and society's continuing needs to protect itself and its citizens from criminal marauders on the other. Accommodation of both of these considerations requires, on occasion, a balancing in its most sensitive form.

A detention of an individual which is reasonable at its inception may exceed constitutional bounds when extended beyond what is reasonably necessary under the circumstances. (See *Willett* v. *Superior Court* (1969) 2 Cal.App.3d 555, 559 [83 Cal.Rptr. 22]; *Pendergraft* v. *Superior Court* (1971) 15 Cal.App.3d 237, 242 [93 Cal.Rptr. 155]; *People* v. *Rosenfeld* (1971) 16 Cal.App.3d 619, 622-623 [94 Cal.Rptr. 380]; cf. *People* v. *Gale, supra*, 9 Cal.3d 788, 798-799.) In *Pendergraft*, a case involving an unduly prolonged detention, the court properly observed that "[n]o hard and fast rule can be formulated for determining the reasonableness of the period of time elapsing during a detention. The dynamics of the detention-for-questioning situation may justify further detention, further investigation, search, or arrest. The significance of the events, discoveries, and perceptions that follow an officer's first sighting of a candidate for detention will vary from case to case." (Fns. omitted; 15 Cal.App.3d at p. 242.)

As a general proposition, despite defendant's urging, we are disinclined to hold that under no circumstances short of probable cause to arrest may an officer transport a suspect to another location for further interrogation or possible identification. Although one court has suggested that such a procedure is unreasonable and amounts to an arrest without probable cause (*People* v. *Gonsoulin* (1971) 19 Cal.App.3d 270, 275 [96 Cal.Rptr. 548]), other courts recognize that certain circumstances may justify a "transport" detention somewhat similar to that involved herein (*People* v. *Courtney* (1970) 11 Cal.App.3d 1185, 1191-1192 [90 Cal.Rptr. 370]). For example, in *Courtney,* the investigating officer adjourned his interrogation of the suspect when a crowd of potentially hostile students gathered at the detention scene. He transported the suspect to a campus police department and resumed the interrogation there. The court held that "there was no Fourth Amendment compulsion on the police to

choose between an on-the-spot continuation of their investigation at the probable cost of their own safety, *or* abandoning the investigation, . . . We recognize that it is only in a rare case where, absent probable cause for arrest, the removal of a suspect to a police station for further investigation is constitutionally permissible." (11 Cal.App.3d at p. 1192.)

We can conceive of factual situations in which it might be quite reasonable to transport a suspect to the crime scene for possible identification. If, for example, the victim of an assault or other serious offense was injured or otherwise physically unable to be taken promptly to view the suspect, or a witness was similarly incapacitated, and the circumstances warranted a reasonable suspicion that the suspect was indeed the offender, a "transport" detention might well be upheld. Similarly, the surrounding circumstances may reasonably indicate that it would be less of an intrusion upon the suspect's rights to convey him speedily a few blocks to the crime scene, permitting the suspect's early release rather than prolonging unduly the field detention.

Ordinarily there exist less intrusive and more reasonable alternatives to pre-arrest transportation. The officers may call or escort the witness to the detention scene for an immediate viewing of the suspect, or if they are able to procure satisfactory identification from the suspect, arrangements may be made for a subsequent confrontation with the witness. In addition, the consent of the suspect may be sought. As we suggested in *People v. Mickelson, supra,* 59 Cal.2d 448, 454, rather than conduct an illegal car search the officers could' have requested defendant "to accompany the officers the few blocks to the [crime scene] . . . for possible identification . . . ." (See also *People v. Hanamoto* (1965) 234 Cal.App.2d 6, 13-15 [44 Cal.Rptr. 153]; *People v. Gibson* (1963) 220 Cal.App.2d 15, 24 [33 Cal.Rptr. 775].)

In the instant case, the officers pursued none of these alternative procedures. Instead, they handcuffed the suspects and conveyed them to the Marx home. Without arrest and in the absence of any exigency, the initial detention was continued by means of transportation followed by further interrogation. Under the facts of this case the officers' procedures violated defendant's constitutional rights. The applicable principles have been well expressed in a recent text on the subject of arrests: "Decisions made at different stages in the criminal justice process vary in their effect upon the person being dealt with. Generally, it can be said that decisions carrying more serious consequences for the individual require a greater degree of certainty that he is in fact guilty. This suggests that the

propriety of field interrogation where there are insufficient grounds for arrest may depend upon whether the harmful effects are substantially less than those which result from a formal arrest." (Fn. omitted; LaFave, Arrest, The Decision to Take a Suspect into Custody (1965) ch. 16 at p. 346; see also pp. 347-349.) While in the instant case the detention procedure employed by the officers was not necessarily "harmful" to defendant in any permanent sense, the restraint upon his personal freedom was measurably greater than mere stationary field interrogation. We hold that it was impermissibly so.

The police activity in the record reveals proper initial detention, improper transportation, further interrogation and inspection of defendant's apparel. The sequence was unfortunate because the continued police investigation revealed circumstances that seemingly point unerringly to defendant's complicity in the burglary. Nonetheless, the identification of shoes and currency, so incriminating to defendant, followed the transportation detention. It is a fundamental principle in our jurisprudence that an illegal police procedure cannot be justified by its fruits. (See *People* v. *Fein* (1971) 4 Cal.3d 747, 756 [94 Cal.Rptr. 607, 484 P.2d 583] [illegal arrest]; *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113] [illegal search].)

Defendant's motion to suppress evidence should have been granted, for that evidence was the result of an unlawful detention. (See *Davis* v. *Mississippi* (1969) 394 U.S. 721 [22 L.Ed.2d 676, 89 S.Ct. 1394]; *People* v. *Moore* (1968) 69 Cal.2d 674, 680 [72 Cal.Rptr. 800, 446 P.2d 800]; *Pendergraft* v. *Superior Court, supra,* 15 Cal.App.3d 237, 242-243; *People* v. *Lingo* (1970) 3 Cal.App.3d 661, 664-665 [83 Cal.Rptr. 755].) Since the challenged evidence formed the basis for defendant's conviction, the introduction of that evidence constituted reversible error.

The judgment is reversed.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**CLARK, J.**—I dissent.

Assuming arguendo that defendant would not have consented to returning three blocks to the crime scene, what alternatives do the majority offer? "The officers may call or escort the witness to the detention scene for an immediate viewing of the suspect, or if they are able to procure satisfactory identification from the suspect, arrangements

may be made for a subsequent confrontation with the witness." (*Ante,* p. 391.)

It is doubtful whether defendant—reasonably suspected of committing a felony and of then lying to the police about his involvement—could reasonably have been expected to honor a mere promise to appear for a subsequent confrontation with his victims.

On the other hand, immediate confrontation at the crime scene had the following advantages: The victims' memories were fresh. The conditions of initial observation could be reproduced. Defendant and his companion had not had time to intimidate their victims. Further, defendant had not had time to shave off his moustache or to change his light cardigan sweater and dark trousers or, more importantly, his distinctive ripple-soled shoes. Finally, had he been innocent, his innocence could have been established immediately.

The majority's other alternative—making the victims come to defendant—is unacceptable. The victim's rights should be valued at least as highly as a suspected felon's.[1]

I would affirm the judgment.

McComb, J., concurred.

---

[1]In addition it must be asked whether those infringements upon the suspect's freedom which the majority proposes to avoid will only be increased by such procedure. While victims are being transported, considerations of convenience and safety for the detaining officers will reasonably require the suspect be placed in physical custody, either handcuffed in the back of a police unit or held at the nearest police station. A second available police unit must be located and dispatched to the victim's residence, then returned to the suspect's place of detention. Thus, in terms of both manner and length of detention, the degree to which the freedom of a suspect is infringed will equal, if not exceed, that resulting from transporting the suspect to the victim.