Filed 9/10/13  P. v. Tyars CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEWAYNE MICHAEL TYARS et al.,<br><br>    Defendants and Appellants. | B240804<br><br>(Los Angeles County<br>Super. Ct. No. GA082719) |

APPEALS from judgments of the Superior Court of Los Angeles County. Teri Schwartz, Judge.  Affirmed.

Mark S. Givens, under appointment by the Court of Appeal, for Defendant and Appellant Dewayne Michael Tyars.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant Justin David Tyson.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Kenneth Melvin Battle.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Noah P. Hill, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Dewayne Michael Tyars (Tyars), Justin David Tyson (Tyson) and Kenneth Melvin Battle (Battle) were charged with first degree burglary and possessing burglary tools. Tyars was also charged with receiving stolen property. They filed a motion to suppress evidence obtained during a detention following a traffic stop. After the motion was denied, they entered pleas and appealed.

Tyars contends that the motion to suppress should have been granted. We disagree. Our review of the record reveals that his detention was permissible under Fourth Amendment principles.

Appointed counsel for Battle and Tyson each filed briefs pursuant to *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) that raised no issues and requested that we conduct an independent review of the record. We notified Battle on October 16, 2012, and Tyson on August 30, 2012, of the briefs filed by counsel and gave each of them an opportunity, within 30 days, to file a brief or letter identifying arguments for us to consider. That time elapsed, and they submitted no briefs or letters. We reviewed the entire record and found neither error nor arguable issues.

The judgments are affirmed.

## FACTS

*The detention and search*

On March 10, 2011, at 8:46 a.m. in the City of Arcadia, W. Chu called 911 to report that two Black males in their 20's were attempting to break into his house through a rear window. The first male was wearing a light blue shirt and dark colored pants. The second male was wearing a light colored polo shirt with some print on it.[1] They aborted the break in, left the property and walked east on Arborlada Drive toward San Carlos Road.

---

[1]    In the transcript of the 911 call, Mr. Chu says that the first suspect was wearing "a light blue shirt." Mrs. Chu then took the phone. She reiterated that the first suspect was wearing a light blue shirt. When asked what color clothing the second suspect was wearing, she stated, "You know, he's also got a polo shirt. It was lighter colored with some print on it."

San Carlos Road intersects Orange Grove Avenue, which is the dividing line between Arcadia and the City of Sierra Madre. On the Sierra Madre side of Orange Grove Avenue, the street that was San Carlos Road continues on but is named Mountain Trail Avenue.

At 8:47 a.m., Sierra Madre Police Officer Henry Amos was patrolling in Sierra Madre, an area that was predominantly Asian and Caucasian. He was monitoring a second radio in his car that was tuned to the frequency of the Arcadia Police Department and heard a broadcast about a burglary in progress. The dispatcher identified the suspects as two Black males and said that one of the suspects was wearing a light blue shirt and wearing dark pants.[2] In a subsequent broadcast, the dispatcher said the suspects were walking away from the scene in the direction of San Carlos Road. Within a minute, Officer Amos parked 20 feet from the intersection of Mountain Trail Avenue and Orange Grove Avenue. A few minutes later, he saw a white Ford Taurus travel northbound on San Carlos Road and stop at Orange Grove Avenue. A Black male, later identified as Battle, was the driver.[3] A second Black male, later identified as Tyson, was in the front passenger seat and wore a dark colored shirt. The Taurus turned east onto Orange Grove Avenue. Officer Amos saw that the side and rear windows were tinted and constituted a Vehicle Code infraction. He followed. At 8:58 a.m. he ran the license plates and learned that the Taurus was registered in the City of Redlands. The Taurus turned on Santa Anita Avenue headed south toward the 210 freeway, which Officer Amos found odd. To get to that freeway, a local would have taken San Carlos Road south to Foothill Boulevard where there was a closer on-ramp.

---

[2]     Officer Amos at first did not recall hearing a description of the second suspect. He later acknowledge that in his report he wrote that one suspect was described as wearing a light blue "polo-type" shirt, and that the other suspect was described as wearing dark pants and a light-colored shirt. Arcadia Police Officer Kevin Fox testified that the first suspect was described as wearing a blue shirt and dark pants, and the second suspect was described by the dispatcher as wearing a light colored shirt with stripes.

[3]     In a booking photograph taken after Battle's arrest, he was wearing a gray T-shirt.

3

At 8:58 a.m., just after the Taurus turned onto Santa Anita Avenue, Officer Amos conducted a traffic stop based on the window tinting. He approached the vehicle and asked Battle to roll down all the windows. Battle did so. At that point, Officer Amos saw Tyars in the back seat. He was wearing a light blue shirt and dark blue pants, and he matched the description of one of the burglary suspects. Officer Amos asked if Battle had a valid driver's license. He said no. Under Officer Amos's department policy, he could have arrested Battle for both the window tinting and driving without a valid driver's license, and he could have had the vehicle towed away.[4]

Officer Amos asked all of the occupants of the Taurus to produce identification. They complied. After that, the colloquy turned to what Tyars, Tyson and Battle were doing in the area. Tyson said that they had been handing out business cards related to a door-to-door sales business. Officer Amos returned to his patrol car and requested that the Sierra Madre dispatcher inform the Arcadia Police Department that a person who matched the description of one of the burglary suspects had been detained during a traffic stop. By that time, Officer Amos's partner and supervisor from the Sierra Madre Police Department had arrived on the scene. They proceeded to wait for the Arcadia police.

Detective Scott Elenberger from the Arcadia Police Department arrived at the scene a few minutes later, which was approximately 9:02 a.m. Officer Amos handed the identification cards produced by Tyars, Tyson and Battle over to Detective Elenberger and explained everything that had transpired. More Arcadia police officers showed up at the scene to assist.

Officer Amos returned to the Taurus and obtained the keys to the vehicle from Battle because he lacked a valid driver's license.[5] The Arcadia police spoke to Officer Amos's supervisor. At about 9:05, they decided to conduct a felony "high risk traffic

---

[4]    Officer Amos testified that when he approached the Taurus and asked for identification, he was in part biding time until backup arrived.

[5]    The Taurus was registered to Tyars. In his briefs, he contends that the keys were his.

4

stop" because a burglary of an occupied residence is a serious felony. They had to wait for units to arrive to block off the streets and detain the suspects safely. Once the streets were secured, Tyars, Tyson and Battle were ordered out of the Taurus one at a time at gunpoint. By 9:14 a.m., they had all been extracted from the Taurus. Subsequently, they were handcuffed and placed into separate patrol cars.

At about 9:19 a.m., police officers drove Mr. and Mrs. Chu to the scene to make identifications. Mr. Chu identified Tyars based on the clothes he was wearing. Police officers searched the Taurus and found tools, cellular telephones, and two pairs of binoculars. They also found a tan jacket that had stripes.

Tyars, Tyson and Battle all wore shirts without collars.

*The amended information*

The Los Angeles County District Attorney filed an amended information charging Tyson, Battle, and Tyars with first degree burglary (Pen. Code, § 459)[6] (count 1) and possession of burglary tools (§ 466) (count 2). Tyars was also charged with receiving stolen property (§ 496) (count 4). It was alleged that Tyson had two prior convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and one prior serious felony conviction (§ 667, subd. (a)(1)), and he had served three prior prison terms (§ 667.5, subd. (b)); Battle had two prior convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and one prior serious felony conviction (§ 667, subd. (a)(1)), and he had served two prior prison terms (§ 667.5, subd. (b)); and Tyars had one prior conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and one prior serious felony conviction (§ 667, subd. (a)(1)), and had served two prior prison terms (§ 667.5, subd. (b)).

*The motion to suppress*

Tyson filed a motion to suppress evidence obtained during the detention because it was unnecessarily prolonged and therefore not constitutional. Battle and Tyars filed a

---

[6]      All further statutory references are to the Penal Code unless otherwise indicated.

5

joinder. The trial court held a hearing. It denied the motion after finding that the detention was lawful.

*The pleas; the sentences*

Tyson and Battle each pleaded no contest to count 1. In addition, they admitted to a prior conviction for purposes of sections 667, subdivisions (b) through (i) and section 1170.12, subdivisions (a) through (d). Those admissions also supported one allegation pursuant to section 667, subdivision (a)(1). Count 2 and the other enhancement allegations were dismissed. Tyson and Battle each received nine years in state prison comprised of the lower base term of two years, which was doubled pursuant to the Three Strikes law, and a consecutive five-year term for the prior serious felony conviction enhancement. The trial court awarded Tyson and Battle 398 actual days of presentence custody credit and 60 days of local conduct credit for a total of 458 days of presentence custody credit each.

Tyars pleaded no contest to counts 1 and 3. The trial court dismissed count 2 and the enhancement allegations. Tyars was sentenced to a total of four years eight months in state prison, comprised of a middle base term of four years in count 1, and a consecutive eight-month term (one-third the midterm) in count 3. The trial court awarded Tyars one day of actual custody credit.

These timely appeals followed.

## DISCUSSION

**I. Tyars.**

According to Tyars, the police lacked reasonable suspicion that he had committed a crime and therefore his detention was unlawful. In addition, he contends that he was subjected to a de facto arrest without probable cause. As a result, he argues that the trial court erred when it denied his motion to suppress. When reviewing the denial of a motion to suppress, the trial court's factual findings are tested for substantial evidence and its application of the law to those facts is examined de novo. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301.) After review, we conclude that the motion to suppress was properly denied.

6

A. *The detention was lawful.*

A detention is reasonable when "the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The circumstances apparent to the officer must cause him to suspect that (1) a crime has occurred, is occurring, or is about to occur, and (2) the person he intends to detain is involved in criminal activity. (*In re Tony C.* (1978) 21 Cal.3d 888, 893, superseded by statute on other grounds as stated by *In re Christopher B.* (1990) 219 Cal.App.3d 455, 460, fn. 2.) "An investigatory stop exceeds constitutional bounds when extended beyond what is reasonably necessary under the circumstances that made its initiation permissible. [Citation.] Circumstances which develop during a detention may provide reasonable suspicion to prolong the detention. [Citation.] There is no set time limit for a permissible investigative stop; the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly. [Citations.]" (*People v. Russell* (2000) 81 Cal.App.4th 96, 101.) "During the traffic stop, an officer may '"take such steps as [are] reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of the stop."' [Citation.] Reasonable steps may include temporary handcuffing and transportation in a police car. [Citations.]" (*People v. Torres* (2010) 188 Cal.App.4th 775, 785-786 (*Torres*).)

For purposes of this appeal, Tyars concedes that the traffic stop of the Taurus was justified because it had unlawful window tinting.[7] He argues that the officers did not have a lawful basis for converting the routine traffic stop into a high risk traffic stop, or for extending the detention to allow time for Mr. and Mrs. Chu to make field identifications of the suspects. We disagree.

---

[7] Vehicle Code section 26708, subdivision (a)(1) provides: "A person shall not drive any motor vehicle with any . . . material . . . installed, affixed, or applied upon the windshield or side or rear windows."

The specific, articulable facts gave rise to a reasonable suspicion that Tyars had burglarized the Chus' home: the suspects were seen heading on foot to San Carlos Road; within minutes of the burglary, Officer Amos saw two Black males driving northbound on San Carlos Road away from the direction of the burglary; the dispatcher said that the suspects were two Black males; the Taurus was registered in Redlands, which is not a nearby city; it appeared that the Taurus was headed toward the 210 freeway, but the route taken by the driver was not the route that a local would have taken to get to that freeway; Tyars's clothing matched the description of the clothing worn by one of the suspects. At that point, the Constitution allowed the officers to detain Tyars as well as Tyson and Battle until the Chus could make field identifications. (*People v. Harris* (1975) 15 Cal.3d 384, 391 ["The officers may call or escort the witness to the detention scene for an immediate viewing of the suspect"].) The record reveals that the police officers secured the scene and brought the Chus to the scene as quickly as possible. Thus, the length of the detention was reasonable because the police acted diligently to either confirm or dispel their suspicions. Moreover, it "was [not] unreasonable for the [police] to secure [their] personal safety by placing [Tyars] in the patrol car pending" the arrival of the Chus for a field identification. (*Torres*, *supra*, 188 Cal.App.4th at p. 786; *People v. Soun* (1995) 34 Cal.App.4th 1499, 1517 (*Soun*).)

Our conclusion is consistent with *People v. Conway* (1994) 25 Cal.App.4th 385 (*Conway*). In that case, an officer received a dispatch about a burglary in progress at a location that was a quarter mile away. The dispatch explained that two suspects had been seen in a garage. There was no description of the suspects, and there was no mention of a car. The officer proceeded toward the area. It was early, about 3:00 a.m. He saw a brown car turn on a street. Inside the brown car, he saw an older Black male and a young White male. There was no other traffic. The officer conducted a stop less than two minutes from the time he heard the dispatch. His intent was to identify the occupants of the car and have the burglary victim look at them. (*Id*. at pp. 387–388.) The court held that "it was objectively reasonable for the officer to suspect the car's occupants were involved in the burglary." (*Id*. at p. 390.) Here, the police officers had more information

8

at their disposal than the officer in *Conway* because they had a description of the suspects, including what one of the suspects was wearing.  And like in *Conway*, the traffic stop was made within minutes of a nearby burglary.

According to Tyars, "there were far more specific and articulable facts that were *inconsistent* with Battle, Tyson, and Tyars being the perpetrators of the burglary.  None of the three was wearing a collared polo shirt like the victims had reported.  [Citation.]  Also, none of them was wearing the described patterned or striped shirt.  [Citation.]  Additionally, the victims reported that there were two perpetrators, not three.  Moreover, the victims reported that the burglary suspects were traveling on foot in an Eastbound direction [citation], not driving in a vehicle in a Northbound direction . . ."

These points do not shake our conclusion.  Regardless of whether his shirt had a collar, Tyars otherwise fit the description of the suspect, i.e., he was a young Black male wearing a blue shirt and dark pants.  That there were three males in the Taurus is not inconsistent with the report of two burglary suspects.  Officer Amos could have reasonably surmised that the third male in the Taurus was the getaway driver, the look-out or both.  While it is true that the suspects were seen leaving the scene on foot, it was reasonable to conclude that they eventually got into a vehicle.  And even though the suspects were seen traveling eastbound, they were headed toward San Carlos Road, which was a north-south street.  Thus, it was not inconsistent that the victims described the suspects as traveling east.

We recognize that the dispatcher's description of the second suspect's clothing did not match what Tyson or Battle were wearing.  But Officer Amos could have surmised that the description of the clothing was mistaken, or that there was a rational explanation for the discrepancy.  The bottom line is that this one mismatch of information was superficial given all of the other suspicious facts.  It is noteworthy that officers eventually found a tan jacket with stripes.  It is plausible that one of the suspects was wearing the jacket, and that Mrs. Chu had seen that jacket but had mistakenly believed that it was a tan polo shirt with print on it.

9

*B. De facto arrest.*

Tyars contends that when the officers handcuffed him and placed him into a police car pending the field identification, it was a de facto arrest without probable cause and that any evidence gathered after must be suppressed.

We disagree.

"When a detention becomes overly intrusive—by becoming unreasonably prolonged or involving unreasonable protective measures, for example—it evolves into a de facto arrest. [Citation.] An arrest must be justified by probable cause. [Citation.]" (*Torres*, *supra*, 188 Cal.App.4th at p. 786; *People v. Gomez* (2004) 117 Cal.App.4th 531, 538 ["A detention that is unreasonably prolonged amounts to a de facto arrest that must be supported by probable cause to be constitutionally valid"].) Evidence found during a search incident to an unlawful arrest must be excluded. (4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000), Pretrial Proceedings, § 14, p. 212.) Assuming for the sake of argument that the detention was overly intrusive, the trial court did not err. The window tinting "violation that led to the initial detention . . . supplied probable cause for [Tyars's] de facto arrest." (*People v. Gomez, supra*, at p. 538.)

In any event, we conclude that Tyars was not subjected to a de facto arrest because the police officers used the least intrusive means reasonably available under the circumstances to confirm their suspicions. (*Soun*, *supra*, 34 Cal.App.4th at p. 1519.) Our conclusion is bolstered by *Soun*, a case which found an even more intrusive detention to be lawful. There, the defendant was removed from a "car at gunpoint by a large number of police officers, was forced to lie on the ground, was handcuffed and placed in a patrol car, was transported from the site of the stop a distance of three blocks to a parking lot, and then was held at the parking lot for up to an additional thirty minutes, all without being told why he had been stopped or being permitted to communicate with his confederates." (*Id*. at p. 517.) Here, Tyars was not removed from the site of the stop. And by Tyars's own reckoning of the evidence, he was placed in a patrol car sometime between 9:06 a.m. and 9:14 a.m., and that the Chus viewed the three suspects sometime between 9:24 a.m. and 9:30 a.m. Less than 30 minutes transpired between the high risk

10

traffic stop and the identification. The detention did not exceed or even reach the boundary of what is permissible. In our view, the police proceeded with as much speed and efficiency as possible as they waited for units to arrive, closed off the streets, extracted Tyars, Tyson and Battle in a safe manner, and then gave the Chus an opportunity to make identifications.

## II. Tyson and Battle.

By virtue of counsel's compliance with the *Wende* procedure and our review of the record, Tyson and Battle have received adequate and effective appellate review of the judgment entered against them. (*Smith v. Robbins* (2000) 528 U.S. 259, 278; *People v. Kelly* (2006) 40 Cal.4th 106, 109–110.)

**DISPOSITION**

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
                    ASHMANN-GERST

We concur:

_____, P. J.
          BOREN

_____, J.
          CHAVEZ